IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| M&G Transportation, LLC, | ) | Bankruptcy Case No. 24-20129-rlj11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**M&G TRANSPORTATION, LLC'S
CHAPTER 11 SUBCHAPTER V PLAN
OF REORGANIZATION DATED AUGUST 13, 2024**

Harrison A. Pavlasek
State Bar No. 24126906
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile: 817-877-4151
hpavlasek@forsheyprostok.com

*Attorneys for Debtor, M&G Transportation,
LLC*

Patrick W. Carothers (PA ID No. 85721)*
Gregory W. Hauswirth (PA ID No. 307482)*
CAROTHERS & HAUSWIRTH LLP
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA 15220
Telephone: 412-910-7500
Facsimile:  412-910-7510
pcarothers@ch-legal.com
ghauswirth@ch-legal.com

* *Admitted pro hac vice*

*Attorneys for Debtor, M&G Transportation,
LLC*

## Table of Contents

**ARTICLE I – INTRODUCTION** **1**

1.1    Summary of Plan.    1

1.2    The Confirmation Hearing.    1

**ARTICLE II – DEFINITIONS** **2**

**ARTICLE III – BACKGROUND OF M&G TRANSPORTATION, LLC** **10**

3.1    Description and History of Debtor's Business.    10

3.1.1    *Business Operations*    10

3.1.2    *Management and Employees*    10

3.1.3    *Property of Debtor*    11

3.1.4    *Pre-Petition Debt Structure*    11

3.1.5    *Events Leading to the Filing of the Bankruptcy Case*    12

3.2    Liquidation Analysis.    14

3.3    Ability to Make Future Plan Payments and Operate without Further Reorganization.    15

3.4    Debtor's Compliance with the Bankruptcy Code.    16

**ARTICLE IV – DESIGNATION OF AND CLASSES AND TREATMENT OF CLAIMS** **17**

4.1    Unclassified Claims.    17

4.1.1    *Administrative Expense Claims*    17

4.1.2    *Administrative Expense Claim Bar Date*    17

4.1.3    *503(b)(9) Claims*    17

4.1.4    *DIP Facility Claims*    18

4.1.5    *Priority Tax Claims*    18

4.2    Classified Claims.    18

4.2.1    *Class 1 – Triumph Secured Claim*    18

4.2.2    *Class 2 – USSBA Secured Claim*    19

4.2.3    *Class 3 – Interstate Bank Secured Claim*    19

4.2.4    *Class 4 – Financial Pacific Secured Claim*    20

4.2.5    *Class 5 – BMO Bank Secured Claim*    21

4.2.6    *Class 6 – Citizens Bank Secured Claim*    22

4.2.7    *Class 7 – Columbia River Secured Claim*    22

4.2.8    *Class 8 – Daimler Truck Secured Claim*    23

4.2.9    *Class 9 – Samson Secured Claim*                                        24

4.2.10    *Class 10 – Global Merchant Secured Claim*                             24

4.2.11    *Class 11 – IRS Secured Claim*                                         25

4.2.12    *Class 12 – General Unsecured Claims*                                  25

4.2.13    *Class 13 – Equity Security Interests*                                 26

**ARTICLE V – VOTING PROCESS**                                                  **26**

5.1    Classes Entitled to Vote.                                                 26

5.2    Voting Process.                                                           27

5.3    Tabulation of Votes.                                                      27

**ARTICLE VI – CLAIMS OBJECTION PROCESS**                                       **28**

6.1    Claims Bar Date.                                                          28

6.2    Objection Deadline.                                                       28

6.3    Allowance of Claims.                                                      28

**ARTICLE VII – PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES**       **28**

**ARTICLE VIII – MEANS FOR IMPLEMENTATION OF THE PLAN**                         **29**

8.1    Continuation of Operations of M&G Transportation, LLC.                    29

8.2    Preservation of Causes of Actions and Rights.                            29

8.3    Representative of the Estate.                                            30

8.4    Post-Effective Date Plan Implementation.                                 30

8.5    Settlement of Claims and Controversies.                                  31

8.6    Settlement of Avoidance Actions Against Insiders.                        31

**ARTICLE IX – EFFECT OF CONFIRMATION OF PLAN AND INJUNCTION**                  **32**

9.1    Effective Date and Notice.                                              32

9.2    Binding Effect of Plan.                                                 32

9.3    Vesting of Assets.                                                      32

9.4    Discharge.                                                              32

9.5    Injunction Against Interference with Plan.                              33

9.6    Payments under the Plan.                                                33

**ARTICLE X – EVENTS OF DEFAULT**                                             **33**

10.1    Events of Default.                                                     33

10.1.1    *Failure to Make Payments*                                           33

| 10.1.2 | *Failure to Perform Covenants* | 33 |
| 10.1.3 | *Failure to Perform other Terms and Provisions of Plan* | 34 |
| 10.2 | Notice of Event of Default. | 34 |
| 10.3 | Opportunity to Cure Default. | 34 |
| 10.3.1 | *Payment Default* | 34 |
| 10.3.2 | *Non-payment Default* | 34 |
| 10.4 | Creditors' Remedies Upon Event of Default. | 34 |
| 10.5 | Debtor's Rights Reserved. | 35 |
| **ARTICLE XI – MODIFICATIONS OF THE PLAN** | | **35** |
| 11.1 | Amendments Prior to Confirmation Date. | 35 |
| 11.2 | Amendments After Confirmation Date. | 35 |
| 11.2.1 | *Consensual Plan* | 35 |
| *11.2.2* | *Non-consensual Plan* | 35 |
| 11.3 | Effect on Claims. | 35 |
| **ARTICLE XII – RETENTION OF JURISDICTION** | | **36** |
| 12.1 | Retention of Jurisdiction. | 36 |
| 12.2 | Exclusive Jurisdiction. | 37 |
| 12.3 | Abstention. | 37 |
| 12.4 | Rights of Debtor. | 37 |
| **ARTICLE XIII – GENERAL PROVISIONS** | | **37** |
| 13.1 | Certain Rights Unaffected. | 37 |
| 13.2 | Incorporation of Valuation Motion. | 37 |
| 13.3 | Automatic Stay. | 38 |
| 13.4 | Reservation of Rights. | 38 |
| 13.5 | Rights under Section 1191(b) of the Bankruptcy Code. | 38 |
| 13.6 | Headings. | 38 |
| 13.7 | Severability. | 38 |
| 13.8 | Governing Law. | 38 |
| 13.9 | Compliance with Regulations of the Office of the U.S. Trustee. | 38 |

## ARTICLE I – INTRODUCTION

1.1 <u>Summary of Plan</u>.

M&G Transportation, LLC ("<u>Debtor</u>") proposes the following Chapter 11 plan of reorganization (the "<u>Plan</u>") pursuant to Subchapter V of Chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan have the meanings ascribed to such terms in Article II of the Plan.

This Plan provides the Holders of Claims and Equity Security Interests with adequate information to enable them to make an informed judgment concerning the method by which Debtor plans to reorganize and emerge from bankruptcy. If the Bankruptcy Court confirms the Plan, it will be binding on Debtor, Holders of Claims, Holders of Equity Security Interests, and other interested parties.

Debtor has prepared a comprehensive reorganization to preserve its going concern value and future business. Specifically, Debtor, with the assistance of its financial advisor, Ascend Business Services, LLC ("<u>Ascend</u>"), a firm with a well-established reputation as an advisory and consulting firm across the country to distressed companies, has set forth a plan of reorganization that will: (i) meet the operating expenses of Debtor's business; (ii) pay the Holders of Allowed Priority Tax Claims; Allowed Administrative Expense Claims; and Allowed Secured Claims in full; (iii) pay Allowed General Unsecured Claims more than they would receive in a Chapter 7 liquidation; and (iv) sustain the livelihood of no less than 40 families in the greater Amarillo, Texas community.

Given the substantial benefits of the Plan, its treatment of creditors and its ability to allow local jobs to be saved and Debtor to successfully operate going forward, Debtor encourages all parties to vote in favor of the Plan. However, in the event all Impaired Classes fail to vote in favor of the Plan, Debtor will seek for the Bankruptcy Court to confirm the Plan pursuant to Section 1191(b) of the Bankruptcy Code (commonly referred to as a "cram down" plan).

**Accordingly, Debtor strongly urges Holders of Impaired Claims to vote in favor of this Plan.**

1.2 <u>The Confirmation Hearing</u>.

Pursuant to Section 1128 of the Bankruptcy Code, a Confirmation Hearing will be held on the Plan. Enclosed with service of this Plan is a letter outlining the date of the Confirmation Hearing together with accompanying deadlines for Holders of Claims to vote and/or file objections to the Plan in advance of the Confirmation Hearing. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

An outline of the voting process is set forth in Article V of this Plan. Any objection to confirmation of the Plan must be made in writing and specify in detail the name and address of the objecting party, all grounds for the objection and the amount of such party's Claim. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court, the Office

of the United States Trustee, the Subchapter V Trustee, and Counsel for Debtor on or before the deadlines established by the Bankruptcy Court. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Failure by a Holder of an Impaired Claim to timely file an objection to the Plan or timely cast a Ballot in accordance with deadlines established by the Bankruptcy Court shall constitute an agreement by silence to accept the terms contained in this Plan.

Any interested party desiring further information about the Plan should contact legal counsel of record for Debtor, Gregory W. Hauswirth of Carothers & Hauswirth LLP, 680 Andersen Drive, Suite 230, Pittsburgh, PA 15220, telephone: 412.910.7500; facsimile: 412.910.7500; email: ghauswirth@ch-legal.com.

## ARTICLE II – DEFINITIONS

The following terms used herein shall have the respective meanings in this Plan (such meanings to be equally applicable to both the singular and plural):

1) **Administrative Expense Claim** means a Claim for any expense Allowed under Sections 503(b), 507(b), or 546(c)(2) of the Bankruptcy Code and entitled to priority under Section 507(a)(2) of the Bankruptcy Code, including: (a) fees payable under 28 U.S.C. § 1930; (b) actual and necessary costs and expenses incurred in the ordinary course of Debtor's business; (c) actual and necessary costs and expenses of preserving the Estate or administering the Bankruptcy Case; and (d) all claims for professional fees to the extent Allowed by Final Order under Sections 330, 331, or 503 of the Bankruptcy Code.

2) **Allowed** means, with respect to any Claim or Interest, such Claim or Interest or any portion thereof that Debtor has assented to the validity of or that has been: (a) expressly allowed under the Plan; (b) that is not Disputed; (c) that is either allowed or determined by a Final Order of a court of competent jurisdiction; or (d) that is agreed to by Debtor or Reorganized Debtor and the Holder of such Claim or Interest.

3) **Avoidance Actions** or **Avoidance Claims** means any avoidance, recovery, subordination, or other actions or remedies that may be brought on behalf of Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including but not limited to actions or remedies under Sections 510, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code.

4) **Ballot** means the form or forms that will be distributed to Holders of Claims and Interests, together with the Plan pursuant to Section 1125 of the Bankruptcy Code, as applicable to this Bankruptcy Case and in connection with the Plan Proponent's solicitation of acceptances of the Plan.

5) **Bankruptcy Case** means the within captioned Chapter 11, Subchapter V bankruptcy case, Case Number 24-20129, filed on the Petition Date.

6) **Bankruptcy Code** means Title 11 of the United States Code, as amended from time to time, as applicable to this Bankruptcy Case.

7) **Bankruptcy Court** means the United States Bankruptcy Court for the Northern District of Texas, Amarillo Division, having jurisdiction over this Bankruptcy Case and, to the extent of any reference made under Section 157 of Title 28 of the United States Code, the District Court having jurisdiction over this Bankruptcy Case under Section 151 of Title 28 of the United States Code.

8) **Bankruptcy Rule or Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of Title 28 of the United States Code, as amended from time to time, applicable to this Bankruptcy Case, and any Local Rules of the Bankruptcy Court.

9) **Bar Date** means as applicable, (a) July 24, 2024, the date as established for the filing of all non-governmental claims, (b) November 12, 2024, the date as established for the filing of all governmental claims, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for filing Claims.

10) **Business Day** means any day, excluding Saturdays, Sundays, and "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in Amarillo, Texas.

11) **BMO Bank** means BMO Bank, NA.

12) **BMO Bank Secured Claim** means the outstanding balance owed by Debtor to BMO Bank as of the Petition Date. BMO Bank filed Proof of Claim No. 9-1, asserting a Secured Claim in the amount of $144,751.19.

13) **Causes of Action** means any and all Claims, motions, causes of action, choses of action, suits, debts, dues, sums of money, accounts, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, remedies, rights of setoff, third party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including all Claims and any avoidance, recovery, subordination, or other actions against Insiders and/or any other Persons under the Bankruptcy Code, including Avoidance Actions) of Debtor, Debtor in Possession and/or the Estate, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, existing or may be pending on the Effective Date or instituted by Debtor or Reorganized Debtor after the Effective Date against any Person, Entity, or Governmental Unit, based in law or in equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the

date of entry of the Confirmation Order. Under this Plan, all Causes of Action will remain with Debtor or vest in Reorganized Debtor as applicable.

14) **Claim(s)** means a claim against Debtor or its Property as defined in Section 101(5) of the Bankruptcy Code.

15) **Class** means a category consisting of a Holder of Claims or Interests substantially similar in nature to the Claims or Interests of another Holder placed in that category, as designated in Article IV of the Plan.

16) **Collateral** means any Property or Interest in Property of the Estate, subject to a Lien, charge, interest, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge, interest, or other encumbrance is: (a) deemed Secured and Allowed under this Plan; or (b) ultimately not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law.

17) **Confirmation Date** means the date upon which the Bankruptcy Court enters an order confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

18) **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

19) **Confirmation Order** means the order(s) confirming the Plan in accordance with the provisions of the Bankruptcy Code.

20) **Citizens Bank** means Citizens Bank, N.A.

21) **Citizens Bank Secured Claim** means the outstanding balance owed by Debtor to Citizens Bank as of the Petition Date.  Based upon Debtor's books and records, an outstanding balance of $86,376.85 was owed to Citizens Bank as of the Petition Date.

22) **Columbia River** means Columbia River Funding, LLC.

23) **Columbia River Secured Claim** means the outstanding balance owed by Debtor to Columbia River as of the Petition Date.  Based upon Debtor's books and records, an outstanding balance of $114,660.98 was owed to Columbia River as of the Petition Date.  As of the date hereof, Columbia River did not file a Proof of Claim in the Bankruptcy Case.

24) **Copier Lease** means that certain written lease agreement by and between Debtor and Wells Fargo Vendor Financial Services, LLC for an office copier utilized at Debtor's center of operations in Amarillo, Texas.

25) **Daimler Truck** means Daimler Truck Financial.

26) **Daimler Truck Secured Claim** means the outstanding balance owed by Debtor to Daimler Truck as of the Petition Date.  Based upon Debtor's books and records, an outstanding balance of $192,812.30 was owed as of the Petition Date. Daimler Truck did not file a Proof of Claim in the Bankruptcy Case.

27) **Debtor** means M&G Transportation, LLC.

28) **DIP Agreement** shall mean that certain factoring and security agreement between Debtor and DIP Lender with the effective date of October 12, 2020, as amended, approved by the DIP Orders.

29) **DIP Documents** shall mean the DIP Agreement, DIP Orders, and any related agreements, instruments, documents, certificates, and schedules delivered from time to time in connection therewith, as amended, supplemented, restated, or otherwise modified in accordance with the terms thereof.

30) **DIP Facility** shall mean that certain post-petition debtor-in-possession factoring and security agreement pursuant to (a) the DIP Agreement and any and all documents, instruments, or agreements executed or delivered in connection therewith and (b) the DIP Orders.

31) **DIP Facility Claims** shall mean any and all of the Claims held by the DIP Lender derived from, based upon, relating to, or arising under or in connection with the DIP Documents, including Claims for all accrued and unpaid principal, interest, fees, expenses, costs, and other charges and amounts construing obligations pursuant to the DIP Agreement and the DIP Orders.

32) **DIP Lender** shall mean the lender party to the DIP Facility, Triumph Financial Services, LLC f/k/a Advance Business Capital LLC d/b/a Triumph Business Capital.

33) **DIP Orders** shall mean those certain orders of the Bankruptcy Court dated May 17, 2024 (Docket No. 26), approving the DIP Facility on an interim basis and that certain Final Order of the Bankruptcy Court dated May 31, 2024 (Docket No. 46), approving the DIP Facility on a final basis.

34) **Disallowed Claim** means a Claim, or any portion thereof, that (a) is scheduled at zero or as contingent, unliquidated, or disputed and as to which a Bar Date has been established but no Proof of Claim has been filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law; (b) is not scheduled and as to which a Bar Date has been established but no Proof of Claim has been filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law; or (c) has been disallowed by a Final Order.

35) **Disposable Income** shall have the meaning provided for such term in Section 1191(d) of the Bankruptcy Code, being income that is received by Debtor from its business operations, including all proceeds received by Reorganized Debtor that is not reasonably necessary to be expended for the payment of its expenditures necessary for the continuation, preservation, or operation of Debtor's business.

36) **Disputed** means that portion (including, where applicable, the whole) of a Claim that is not an Allowed Claim.

37) **Distribution** means payments issued, where applicable, pursuant to, and in accordance with, this Plan.

38) **Effective Date** means the date on which this Plan shall take effect, which date shall be a Business Day on or after the Confirmation Date on which all conditions precedent to the effectiveness of this Plan have been satisfied, or, if capable of being waived, waived, which date shall be specified in a notice filed by Reorganized Debtor with the Bankruptcy Court.

39) **Entity** has the meaning set forth in Section 101(15) of the Bankruptcy Code.

40) **Equity Security** has the meaning set forth in Section 101(16) of the Bankruptcy Code and shall include any membership Interest or other ownership Interest in Debtor, whether certificated or uncertificated.

41) **Estate** means the bankruptcy estate of M&G Transportation, LLC, pursuant to Section 541 of the Bankruptcy Code.

42) **Final Order** means an order as to which the time to appeal, petition for *certiorari*, or move for re-argument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for re-argument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, move for re-argument, or rehearing shall have been waived in writing or, in the event an appeal, writ of *certiorari*, or re-argument or rehearing thereof has been sought, such order shall have been affirmed by the highest court to which such order was appealed, or *certiorari* has been denied, or from which re-argument or rehearing was sought, and the time to take any further appeal, petition for *certiorari*, or motion for re-argument or rehearing shall have expired.

43) **Financial Pacific** means Financial Pacific, N.A.

44) **Financial Pacific Secured Claim** means the outstanding balance owed by Debtor to Financial Pacific as of the Petition Date.  Financial Pacific filed Proof of Claim No. 5-1, asserting a Secured Claim in the amount of $80,750.18.

45) **General Unsecured Claim** means any Claim against Debtor existing as of the Petition Date other than a Secured Claim, Administrative Claim, Priority Tax Claim, or Other Priority Claim.

46) **Global Merchant** means Global Merchant Cash, Inc.

47) **Global Merchant Secured Claim** means the outstanding balance owed by Debtor to Global Merchant as of the Petition Date.  Global Merchant filed Proof of Claim No. 19-1, asserting a Secured Claim in the amount of $739,469.35.

48) **Governmental Unit** has the meaning set forth in Section 101(27) of the Bankruptcy Code.

49) **Holder** means a Person or entity holding a Claim or Interest.

50) **Impaired** has the meaning set forth in Section 1124 of the Bankruptcy Code.

51) **Insider** has the meaning set forth in Section 101(31) of the Bankruptcy Code, or as may be determined by applicable law.

52) **Interest** means any Equity Security of Debtor existing immediately prior to the Effective Date.

53) **Interstate Bank** means Interstate Bank.

54) **Interstate Bank Secured Claim** means the outstanding balance owed by Debtor to Interstate Bank as of the Petition Date.  Interstate Bank filed Proof of Claim No. 13-1, asserting a Secured Claim in the amount of $1,285,000.00 together with a General Unsecured Claim for a deficiency balance owed on the Interstate Loans in the amount of $1,622,160.67.

55) **IRS** means the United States Internal Revenue Service.

**IRS Secured Claim** means the Secured Claim asserted by the IRS as the result of a Notice of Federal Tax Lien recorded on April 22, 2024.  The IRS filed Proof of Claim No. 4-2, asserting a Secured Claim in the amount of $513,808.17.

56) **Lien** means a judicial lien as defined in Section 101(36) of the Bankruptcy Code; a lien as defined in Section 101(37) of the Bankruptcy Code; a security interest as defined in Section 101(51) of the Bankruptcy Code; a statutory lien as defined in Section 101(53) of the Bankruptcy Code; and any other lien, interest, charge, or encumbrance.

57) **Order for Relief** means the commencement of the Bankruptcy Case on the Petition Date in accordance with Section 301(b) of the Bankruptcy Code.

58) **Other Priority Claim** means any Claim (or portion of a Claim) entitled to priority under Section 507(a) of the Bankruptcy Code other than Priority Tax Claims and Administrative Claims.

59) **Person** has the meaning set forth in Section 101(41) of the Bankruptcy Code.

60) **Petition Date** means May 15, 2024, the date on which Debtor commenced this Bankruptcy Case.

61) **Plan** means this Chapter 11 Subchapter V Plan of Reorganization dated August 13, 2024, as including exhibits, schedules, supplements, and/or attachments annexed hereto, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the terms hereof.

62) **Plan Proponent** means Debtor and Debtor in Possession, M&G Transportation, LLC.

63) **Post-Petition** means the period commencing on the entry of the Order for Relief on May 15, 2024, and continuing through the Effective Date of the Plan.

64) **Pre-Petition** means the period of time before the entry of the Order for Relief on May 15, 2024.

65) **Pre-Petition Loan Documents** means any and all the loan documents supporting Secured Claims.

66) **Prime Rate** means for any day a per annum rate of interest equal to the "prime rate," as published in the "Money Rates" column of *The Wall Street Journal*, from time to time, or if for any reason such rate is no longer available, the rate reasonably established by the note Holder as its prime rate. Interest shall be computed on the basis of the actual number of days elapsed over a 365-day year, including the first and the last day.

67) **Priority Claims** means a Claim, other than an Administrative Expense Claim, a Secured Claim, or a General Unsecured Claim, which specifically arises under Section 507(a) of the Bankruptcy Code.

68) **Priority Tax Claim** means any Claim of a Governmental Unit, as defined in Section 101(27) of the Bankruptcy Code, entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

69) **Professionals** means a Person: (a) employed in the Bankruptcy Case pursuant to an order of the Bankruptcy Court under Sections 327, 328, 363, or 1103 of the Bankruptcy Code and compensated for services under Sections 327, 328, 329, 330, and 331 of the Bankruptcy Code or order of the Bankruptcy Court; or (b) for whom compensation and reimbursement has been Allowed by a Final Order under Section 503(b) of the Bankruptcy Code. For the avoidance of doubt, the Subchapter V Trustee appointed pursuant Section 1183(a) of the Bankruptcy Code is also considered a Professional hereunder.

70) **Proof of Claim** means a proof of Claim filed against Debtor in this Bankruptcy Case.

71) **Property** has the meaning ascribed to the term "property of the estate" within Section 541 of the Bankruptcy Code.

72) **Pro Rata**, with respect to an Allowed Claim in a given Class, means that same proportion that the Allowed Claim bears to the aggregate of all Allowed Claims in such Class.

73) **Reorganized Debtor** means Debtor, as reorganized immediately following the Effective Date with all assets and/or Property of Debtor, fully vesting in Reorganized Debtor pursuant to Section 1141 of the Bankruptcy Code.

74) **Samson** means Samson MCA, LLC d/b/a Samson Funding.

75) **Samson Secured Claim** means the outstanding balance owed by Debtor to Samson as of the Petition Date. Samson filed Proof of Claim No. 21-1, asserting a Secured Claim in the amount of $334,183.26.

76) **Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by Debtor under Section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time through the Effective Date.

77) **Secured Claim** means a Claim (i) secured by a Lien on Collateral, to the extent of the value of such Collateral (a) as set forth in the Plan, (b) as agreed to by the Holder of such Claim and Debtor, or (c) as determined by a Final Order in accordance with Section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the Holder thereof under Section 553 of the Bankruptcy Code.

78) **Secured Creditors** means any Holder of a Secured Claim, whom Debtor asserts are the claimants set forth in Class Nos. 1 through 11 of this Plan.

79) **Subchapter V Trustee** shall mean Katharine B. Clark, the Trustee appointed in this Bankruptcy Case pursuant to Section 1183 of the Bankruptcy Code.

80) **Subchapter V Trustee Fees** shall mean those fees paid to be paid to the Subchapter V Trustee pursuant to Section 330 of the Bankruptcy Code.

81) **S. Washington Street Lease** means that certain written lease agreement by and between Debtor and Micah Geran for non-residential real property located at 6400 S. Washington Street, Amarillo, TX 79118, which Debtor uses as its center of operations.

82) **Triumph Secured Claim** means the outstanding balance owed by Debtor to Triumph Financial Services, LLC f/k/a Advance Business Capital LLC d/b/a Triumph Business Capital, as of the Petition Date.

83) **USSBA** means the United States Small Business Administration.

84) **USSBA Secured Claim** means the outstanding balance owed by Debtor to the USSBA as of the Petition Date.  The USSBA filed Proof of Claim No. 15-1, asserting a Secured Claim of $149,345.47.

85) **Voting Deadline** shall mean the date by which a claimant entitled to vote on the Plan must deliver the Ballot to counsel for Debtor.


## ARTICLE III – BACKGROUND OF M&G TRANSPORTATION, LLC

3.1    Description and History of Debtor's Business.

On May 15, 2024, and as more fully set forth in the *Declaration of Manuel Gutierrez in Support of Chapter 11 Petition and First Day Motions* filed at Docket No. 14 and attached hereto as Exhibit C, Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas.  Debtor elected to file for bankruptcy protection to protect itself from substantial creditor pressure.  If Debtor had not filed for bankruptcy protection, such creditor pressure may have led to an inability of Debtor to operate and possibly an unfortunate and unnecessary liquidation of Debtor to the detriment of Debtor's creditors as a whole.

### 3.1.1    *Business Operations*

Debtor is a freight transportation company based in Amarillo, Texas.  The company provides regional, long-haul, and coast-to-coast transportation for refrigerated products.  Debtor is owned by M&G Transportation Holdings, LLC.  The membership interests of M&G Transportation Holdings, LLC are owned by Manuel Gutierrez (50%) and German Gutierrez (50%).  In 2016, Messrs. Gutierrez began to operate Debtor, starting with one truck driven by themselves to haul regional groceries.  As of the date hereof, Debtor presently maintains a fleet of 71 trucks and trailers and contracts with additional third parties to support its customer base.

### 3.1.2    *Management and Employees*

Manuel Gutierrez serves as the President of Debtor and German Gutierrez serves as Vice President of Debtor.  Together Messrs. Guitierrez oversee all operational, financial, and human resource matters of Debtor, as well as Debtor's sales and marketing efforts.  Debtor currently employees 29 full-time employees in the greater Amarillo, Texas community and subcontracts with approximately 15-20 full-time independent drivers to deliver its customers' freight requirements.

Debtor also employees several members of the Gutierrez family within its operations, including (at their current salaries/rate of pay):

- Manuel Gutierrez, President of Debtor ($90,000.00);
- German Gutierrez, Vice President of Debtor ($90,000.00);

- Cecilia Gutierrez, Office Manager ($75,000.00); and
- Alejandra Gutierrez, Dispatch Manager ($19.00 per hour).

Under this Plan, such individuals will remain as executives and employees of Debtor and will continue to be compensated at the same rates or pay as listed above.

### 3.1.3   *Property of Debtor*

Debtor does not own any real property and leases its operating facility through a third party (an individual named Micah Geran).  The extent of Debtor's Property is set forth in Debtor's Schedules filed in this Bankruptcy Case (Docket No. 66) and is outlined in Debtor's "Liquidation Analysis" as defined and outlined in Section 2.2 herein.  Such Property primarily consists of cash, accounts receivable, office furniture and equipment, as well as a fleet of 71 trucks and trailers.  All of Debtor's Property is fully encumbered by a series of Claims owed to Secured Creditors, as set forth in the Liquidation Analysis and Article IV of this Plan.  A set of Debtor's Schedules is available on the Bankruptcy Court's docket and available by request via email to ghauswirth@ch-legal.com.

### 3.1.4   *Pre-Petition Debt Structure*

- **Factoring of Accounts Receivable.**  Historically and following the Petition Date, Debtor maintains its cash flow by factoring 85-90% of its accounts receivable through Triumph Financial Services, LLC f/k/a Advance Business Capital LLC d/b/a Triumph Business Capital ("Triumph").  Triumph is in the business of providing alternative financing solutions to businesses, including the purchase of accounts receivable from customers with the possible obligation of the customer to repurchase those same accounts receivable from Triumph in the future if certain conditions are met.  Debtor cannot operate from a cash flow perspective if it is unable to immediately monetize its accounts receivable.

  Debtor partnered with Triumph to factor its receivables in 2020.  Pursuant to the terms of the parties' agreement (the "2020 Factoring Agreement"), Triumph is entitled, among other things, to purchase Debtor's accounts receivable generated from Debtor's provision of domestic freight transportation services to its customers.  Post-Petition, Triumph agreed to continue to factor Debtor's accounts receivable pursuant to the DIP Orders.

  The 2020 Factoring Agreement and the DIP Facility obligate Debtor to repurchase certain of the accounts receivable previously purchased by Triumph if certain conditions were met under the 2020 Factoring Agreement (a "Repurchase Obligation").  Debtor's Repurchase Obligation is secured by certain assets of Debtor, or the "Collateral", as that term is defined in the 2020 Factoring Agreement.  Specifically, "Collateral" is defined in Sections 1.10 and 7 of the 2020 Factoring Agreement to include (but is not limited to): "All of [Debtor's]…Accounts, Chattel Paper, Deposit Accounts, Inventory, Equipment, Instruments, Investment Property, Documents, Letter of Credit Rights, Commercial Tort Claims and General Intangibles."  As a result, the 2020 Factoring Agreement, as amended, provides a first-priority Lien on all of Debtor's Property to Triumph.

However, given the strength of Debtor's accounts receivable throughout its relationship with Triumph, Debtor has rarely, if ever, been required to repurchase any of its accounts receivable sold to Triumph.

- **Tax Debt.**  Debtor's outstanding tax obligations include long-term tax liabilities owed to the IRS and the Texas Comptroller for Public Accounts.  Such long-term tax liabilities to the IRS stem from Debtor's failure to remit significant payroll taxes between the fourth quarter of 2022 and the second quarter of 2023 (the "941 Obligations").  While Debtor is now current on its payroll taxes, the 941 Obligations remain outstanding.  Debtor's obligations to the Texas Comptroller of Public Accounts consist of state business franchise taxes prior to the Petition Date.  Therefore, Debtor identifies that the following Priority Tax Claims exist in this Bankruptcy Case:

    ▪ Internal Revenue Service. The IRS Priority Tax Claim consists of the 941 Obligations for the calendar quarters ending December 31, 2022; March 31, 2023; and June 30, 2023, in an amount of $530,808.17.

    ▪ Texas Comptroller of Public Accounts. The Texas Comptroller Priority Tax Claim consists of state business franchise tax due prior to the Petition Date in an amount of $4,844.72.

    ▪ Aside from the IRS Priority Tax Claim and the Texas Comptroller of Priority Tax Claim, Debtor does not anticipate any additional Priority Tax Claims.

- **Secured Claims.**  Over the course of time, Debtor: (a) obtained working capital; (b) financed a fleet of vehicles/tractors and trailers; and (c) re-financed a series of loans and obligations, each of which give rise to the Secured Claims detailed in Article IV of this Plan.  Through the Plan, Debtor seeks to pay Allowed Secured Claims in full over time and to reclassify certain Secured Claims (in whole or in part) as General Unsecured Claims in accordance with Section 506 of the Bankruptcy Code where the value of the Collateral securing the Secured Claim is less than the value of the Secured Claim.

- **General Unsecured Claims.**  As of the Petition Date, the books and records of Debtor, together with Proofs of Claim filed in this Bankruptcy Case, reflect an estimated $4.5 million, consisting primarily of unsecured trade debt and deficiency balances on financing agreements entered into by Debtor over time.

3.1.5    *Events Leading to the Filing of the Bankruptcy Case*

There were various factors and circumstances that led to Debtor's decision to file a Chapter 11 bankruptcy proceeding.  Most significantly, Debtor needed to reduce its debt load and contractual obligations to pay such debt.  Despite best efforts to reach out of court resolutions, Debtor was unable to come to terms with all of its creditors.  Given mounting creditor pressure, Liens filed by the Internal Revenue Service and lawsuits, Debtor filed the Bankruptcy Case.

By way of historical background, Debtor rapidly expanded its operations since its formation in 2016 – a product of the substantial work ethic of the Gutierrez family; an earned reputation of superior performance; and Debtor's geographically favorable location.  Debtor expanded its fleet of vehicles/tractors and trailers (the "Company Fleet") through a series of acquisitions and leases, which were financed through arrangements between Debtor and various equipment financing/leasing companies, including but not limited to Penske Truck Leasing Co., L.P, Mack Financial Services, Alladin Capital, Inc., Daimler Truck, Interstate Bank, Happy State Bank, and Hereford Credit Union. The monthly debt service on such obligations exceeded $45,000.00 per month.

Unfortunately, the Gutierrez's lack of fundamental business experience given their relative youth — both in terms of their actual ages and the age of Debtor's business — prevented them from anticipating the need for working cash as Debtor initially expanded.  As a direct result, Debtor gradually lacked the ability to pay its operating expenses and debt service on time as it grew. Faced with the reality of losing the ability to sustain its operations if it failed to pay its operating expenses, Debtor sought immediate cash. Not surprising, most of the sources of cash proved to be expensive.  As a result, Debtor struggled to maintain its ability to meet its operational obligations and satisfy its ongoing debt service.

While tight, Debtor realized levels of profitability through the end of 2021, while producing $16.2 million of revenue.  By 2022, Debtor further expanded and grew its revenues to an annual best of $18.6 million.  However, the corresponding need for cash to pay expenses increased and Debtor yet again needed cash sources.  Initially, to obtain relief, Debtor re-financed all debt relating to the Company Fleet, reducing the monthly debt service on the Company Fleet to $33,500.00 per month.  However, the debt service was too high.  To that end, beginning in late 2022 and in the first half of 2023, Debtor sought better terms on the debt relating to the Company Fleet, and refinanced again through a series of loans with Interstate Bank (the "Interstate Loans"). Specifically, Between 2022 and 2023, Debtor entered into a series (no less than 6) promissory notes, security agreements with Interstate Bank in excess of $2.9 million.  All of Debtor's indebtedness to Interstate Bank was cross-collateralized by a June 27, 2023 Cross-Collateralization and Cross-Default Agreement.  Such Collateral included, among other things, first-priority Liens on no less than 80 vehicles, tractors and trailers as well as 2 residential rental properties.  The loans were also secured by junior Liens on personal property pursuant to a UCC-1 Financing Statement filed by Interstate Bank.

These conventional sources, however, were not enough, and Debtor had to borrow from certain merchant-cash-advance lenders, being Samson and Global Merchant (the "MCA Loans").  These borrowings totaled approximately $1 million.   The obligations under the MCA Loans required weekly debt service payments in excess of $23,000.00.   These debt service payments were debited directly from the bank accounts of Debtor.

While Debtor was struggling to work through its cash issues, late in 2022 it also began to experience some industry issues.  Specifically, as 2022 came to a close, a significant reduction in the per-mile rates paid to trucking companies occurred due to an oversaturated market of

drivers (up to $0.50/per mile). As a direct result, revenue levels fell by 15% in 2023. Despite its efforts, Debtor was unable to reduce its operating costs in a corresponding manner. This led to an inability by Debtor to service all of its operational obligations and its now substantial debt service obligations to Interstate Bank, the IRS on the 941 Obligations, and the MCA Loans.

In August 2023, Debtor retained Ascend as its financial advisor, and specifically its Director of Workout and Restructuring, Roger Ferrante. Ascend is a national consulting firm with a focus on financial and operational advisory to private and closely-held businesses in distressed circumstances. Under Mr. Ferrante's guidance, Ascend engaged in a global review of the business operations of Debtor, assisted in stabilizing Debtor's business both operationally and financially, and developed a thorough understanding of Debtor's financial circumstances. Ascend determined that Debtor needed to downsize substantially in order to be profitable and restructure its debt service on its Company Fleet. It was determined that Debtor had a multitude of trucks and trailers within the Company Fleet that were not being utilized (or were substantially underutilized). It was imperative in Ascend's view that such vehicles/tractors and trailers be essentially liquidated — meaning returned to the party that leased or financed such vehicles/tractors and trailers, and otherwise sold. If Debtor did this, Ascend determined that Debtor could produce approximately $9-10 million in annual revenue with the downsized Company Fleet. Ascend further concluded that Debtor could be profitable at this revenue level, provided that Debtor only paid its germane operating expenses going forward, debt service on fair market value of the vehicles/tractors and trailers it would retain and utilize, the debt service owed on Allowed Secured Claims and the 941 Obligations — as well as a very limited payment stream to Holders of General Unsecured Claims, which would consist of unsecured trade debt, the MCA Loans, and deficiency Claims owed to financing companies on account of the vehicles/tractors and trailers acquired by Debtor over time.

However, on April 22, 2024, the IRS recorded a Notice of Federal Tax Lien (the "NFTL") in the State of Texas for the 941 Obligations. Upon learning of the recording of the NFTL, Triumph immediately informed Debtor that it could not continue the 2020 Factoring Agreement if action was not taken by Debtor to either remove the NFTL or otherwise obtain a subordination agreement from the IRS in favor of Triumph.

Given these facts and circumstances, and the timing of the NFTL, in order to accomplish its goal of surviving as a going concern and effectuating Ascend's plan, Debtor commenced this Bankruptcy Case. Despite the need to commence a Chapter 11 process, Debtor, with the assistance of Ascend, is postured for success operationally and will continue to emerge financially from its circumstances as Reorganized Debtor under this Plan.

3.2    Liquidation Analysis.

The alternative to this Plan would be a Chapter 7 liquidation, whereby the assets of the Estate would be liquidated and proceeds distributed to Holders of Allowed Claims. To confirm the Plan, the Bankruptcy Court must find that all Holders of Impaired Claims who do not accept the Plan will receive at least as much under the Plan as such Claims would receive in a Chapter 7 liquidation.

Debtor believes continued operations will provide a greater Distribution to Holders of Allowed Claims than conversion to a Chapter 7 bankruptcy proceeding. Conversion to Chapter 7 would require the appointment of a Chapter 7 trustee. Additionally, all of Debtor's assets are encumbered by the Claims of a series of Secured Creditors to secure the repayment of their Claims. As a result, it would be anticipated that the Secured Creditors would likely move for relief from the automatic stay in the Chapter 7 case and seek to liquidate their Collateral. In any liquidation, the value of Debtor's assets will be significantly less than the value of these same assets as a going concern.

Further, the IRS and the Texas Comptroller of Public Accounts have Priority Tax Claims in the aggregate amount of $535,652,28. In a Chapter 7 liquidation, these Priority Claims will have to be paid prior to any Distributions to Holders of Allowed General Unsecured Claims. Under a plan of reorganization, such Priority Tax Claims can be paid out over time and payments to Holders of Allowed General Unsecured Claims can occur during this same time period.

Additionally, a Chapter 7 trustee would be required to hire Professionals that have not been involved with the Bankruptcy Case. These Professionals will need to get up to speed on the Bankruptcy Case, increasing administrative costs to the Estate. Additionally, a Chapter 7 trustee is entitled to a commission for any Distribution it makes to Holders of Claims under the Bankruptcy Code. The commission is treated as an Administrative Expense Claim. The Plan will not create an Administrative Expense Claim, as Debtor is not entitled to a commission for dividends distributed to Holders of Allowed Claims under the Plan.

A liquidation analysis is attached as Exhibit A (the "Liquidation Analysis") and shows what all creditors of Debtor would receive in a Chapter 7 liquidation. As set forth on Exhibit A, all Allowed Claims under the Plan will exceed their recovery through a Chapter 7 liquidation. The Holder of the Equity Security Interests shall retain its ownership of Debtor.

3.3     Ability to Make Future Plan Payments and Operate without Further Reorganization.

Debtor intends to continue to operate as a going concern. Debtor will fund the Plan through the continuation of its operations through its downsized Company Fleet and its recovery on Avoidance Claims, including those Avoidance Claims that it has resolved through this Plan. Debtor seeks to restructure its debts with the 941 Obligations, receive favorable concessions from certain Secured Claims as outlined in Article IV of this Plan, and address its General Unsecured Claims through this Plan in order to improve its cash flow and streamline its ability to make payments under this Plan.

The operation of Debtor's business can (i) support its payments to the Holders of Allowed Priority Tax Claims and Allowed Administrative Expense Claims; (ii) meet the operating expenses of the business; (iii) pay Allowed Secured Claims over time; and (iv) pay Allowed General Unsecured Claims pursuant the terms of this Plan. Debtor submits that it will generate enough cash over the life of the Plan to make the required Plan payments and operate Debtor's business. With the assistance of Ascend, Debtor developed the projections set forth on Exhibit B setting forth gross

income, expenses and operating income for a three-year period. Based upon the projections, Debtor believes it can service its obligations to its creditors under the Plan.

The projections are reasonable and calculated assumptions that are based upon Debtor's historical financial performance, industry trends, and review of available documentation from fiscal years 2020 through 2024. Further, with the assistance of Ascend, Debtor has right-sized its Company Fleet and established management controls and procedures to manage its business within the constraints of the projected cash flow.

As set forth in Article Sections 8.2 and 8.6 of this Plan, Debtor further recognizes that certain Avoidance Actions exist to recover funds of Debtor pursuant to Sections 547 and 548 of the Bankruptcy Code.

3.4     <u>Debtor's Compliance with the Bankruptcy Code</u>.

Debtor has filed this Plan in good faith. Debtor represents that the information contained herein is true and correct to the best of its knowledge and understanding. Debtor believes that the Plan complies with all applicable provisions of the Bankruptcy Code. Debtor does not believe that Subsections (a)(6), (a)(13), (a)(14), and/or (a)(15) of Section 1129 of the Bankruptcy Code are applicable to Debtor or the Plan. Debtor affirmatively asserts that the Plan complies with the applicable provisions of the Bankruptcy Code (Subsection 1129(a)(1) of Section 1129 of the Bankruptcy Code) and has been proposed in good faith and not by any means forbidden by law (Subsection 1129(a)(1) of Section 1129 of the Bankruptcy Code). Further, Debtor affirmatively asserts that it has complied with the applicable provisions of the Bankruptcy Code (Subsection 1129(a)(2) of Section 1129 of the Bankruptcy Code). Debtor affirmatively asserts that the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of Debtor (Subsection 1129(a)(11) of Section 1129 of the Bankruptcy Code). Debtor will seek confirmation under Section 1191(b) of the Bankruptcy Code, if necessary.

[THIS SPACE INTENTIONALLY LEFT BLANK]

## ARTICLE IV – DESIGNATION OF AND CLASSES AND TREATMENT OF CLAIMS

4.1     <u>Unclassified Claims</u>.

4.1.1     *Administrative Expense Claims*

Claims that make up unclassified Administrative Expense Claims consist of Professionals hired by the Estate during the Bankruptcy Case; the fees allowed the Subchapter V Trustee pursuant to the Bankruptcy Code; and all Claims allowed under Section 503 of the Bankruptcy Code and given administrative priority under Section 507(a) of the Bankruptcy Code. The known Administrative Expense Claims of Debtor consist of (a) the legal fees and expenses of Carothers & Hauswirth LLP ("<u>C&H</u>") and Forshey & Prostok, LLP ("<u>Forshey</u>"); (b) Professional fees and expenses of Ascend; and (c) the Subchapter V Trustee Fees.

Pursuant to the Bankruptcy Code, C&H, Forshey, Ascend and the Subchapter V Trustee will be required to seek final approval from the Bankruptcy Court of their compensation.  Upon the later of the Effective Date or final approval of compensation by the Bankruptcy Court, Debtor will pay the Administrative Expense Claims in full within thirty (30) days of the Effective Date or final approval, unless the administrative claimant agrees otherwise.  If the Plan is confirmed pursuant to Section 1191(b) of the Bankruptcy Code, Debtor may extend out payment of the Administrative Expense Claims as allowed pursuant to Section 1191(e) of the Bankruptcy Code and pay them in equal monthly installments over a period no longer than the 4 years from the Effective Date or final approval.

4.1.2     *Administrative Expense Claim Bar Date*

All requests for allowance and payment of Administrative Expense Claims must be filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules within thirty (30) days after entry of the Confirmation Order.  Administrative Expense Claims that are not timely filed will be disallowed automatically and deemed forever barred, estopped, and enjoined from assertion, and without the need for any objection by Debtor or Reorganized Debtor or any further notice to or action, order, or approval of the Bankruptcy Court, and are not enforceable against Debtor and/or Reorganized Debtor.

4.1.3     *503(b)(9) Claims*

Except to the extent that a Holder of an Allowed 503(b)(9) Claim agrees to a different treatment, Holders of Allowed 503(b)(9) Claims will be paid in full by Reorganized Debtor in cash within thirty (30) days after the date on which an order allowing any 503(b)(9) Claim becomes a Final Order or as soon as reasonably practicable thereafter.  As of the date of this Plan, Debtor does not anticipate any Allowed 503(b)(9) Claims.

4.1.4     *DIP Facility Claims*

Post-Petition, Triumph has continued to factor accounts receivable of Debtor pursuant to the DIP Facility and the DIP Orders.  As set forth in the DIP Facility and the DIP Orders, Triumph is entitled to a DIP Facility Claim for any Repurchase Obligations that exist for Triumph's Post-Petition purchase of accounts receivable. On the Effective Date, the Holder of Allowed DIP Facility Claims (if any) shall receive from Reorganized Debtor, in full satisfaction, release, settlement, and discharge of such Allowed DIP Facility Claims: (1) payment in full in cash; or (2) such other terms as agreed to among Reorganized Debtor and Triumph.  As of the date hereof, Debtor does not anticipate any DIP Facility Claims.

4.1.5     *Priority Tax Claims*

a)  <u>Internal Revenue Service</u>. The IRS Priority Claim consists of the 941 Obligations for the calendar quarters ending December 31, 2022; March 31, 2023; and June 30, 2023, in an amount of $530,808.17.  Following the Effective Date and net of payments made by Debtor following the Petition Date on account of the IRS Priority Claim, the IRS shall receive deferred quarterly cash payments over a period not exceeding five (5) years from the Order for Relief entered in this Bankruptcy Case (May 15, 2024) in accordance with the time period allowed under 11 U.S.C. §1129(a)(9)(c).  The quarterly payments Reorganized Debtor shall remit to the IRS will be $26,540.41.

b)  <u>Texas Comptroller of Public Accounts</u>. The Texas Comptroller of Public Accounts' Priority Tax Claim consists of state business franchise tax in an amount of $4,844.72. Following the Effective Date, the Texas Comptroller of Public Accounts shall receive deferred quarterly cash payments over a period of one year from the Order for Relief entered in this Bankruptcy Case (May 15, 2024) in accordance with the time period allowed under 11 U.S.C. §1129(a)(9)(c).  The quarterly payments Reorganized Debtor shall remit to the Texas Comptroller of Public Accounts will be $1,211.03.

c)  Aside from the IRS Priority Tax Claim and the Texas Comptroller of Public Accounts' Priority Tax Claim, Debtor does not anticipate any additional Priority Tax Claims.

4.2     <u>Classified Claims</u>.

4.2.1     *Class 1 – Triumph Secured Claim*

- **Impairment and Voting**.  Class 1 is not Impaired under the Plan.  The Holder of the Class 1 Claim is deemed to accept the Plan.

- **Background.**  Pre-Petition, and as detailed in Section 3.1.4 herein, Triumph served as the factorer of Debtor's accounts receivable.  As of the Petition Date, Triumph's Pre-Petition Claim was unliquidated, and no Proof of Claim has been filed.  As set forth in the 2020 Factoring Agreement and the DIP Orders, Triumph is entitled to

a Secured Claim for any Repurchase Obligations that exist for Triumph's Pre-Petition purchase of accounts receivable. Triumph's Secured Claim is secured by a first-priority Lien in all assets of Debtor, including but not limited to all now existing and future accounts, and deposit accounts. Triumph perfected its first-priority security interest by filing a UCC-1 Financing Statement with the Texas Secretary of State's Office under Filing Number 20-0052993252 on October 19, 2020.

- **Treatment.** Once Triumph's Secured Claim is liquidated, Triumph will be paid the full amount of the Triumph Secured Claim, net of any payments made following the Petition Date, in accordance with the terms and conditions of the 2020 Factoring Agreement, as amended.  Triumph will retain its Lien and security interest in Collateral and said Liens and security interests shall be assumed by and encumber such Property of Reorganized Debtor to the same extent and priority as Triumph possessed against Debtor's Property Pre-Petition.

4.2.2    *Class 2 – USSBA Secured Claim*

- **Impairment and Voting**.  Class 2 is not Impaired under the Plan.  The Holder of Class 2 Claims is deemed to accept the Plan.

- **Background.**  On or about August 1, 2020, Debtor acquired a working capital loan from the USSBA pursuant to its economic injury disaster loan program.  The USSBA perfected its security interest against Debtor's assets by filing a UCC-1 Financing Statement with the Texas Secretary of State's Office under Filing Number 20-0041794714 on August 10, 2020.  The USSBA subsequently agreed to subordinate such security interest to the security interest of Triumph, pursuant to that certain Subordination Agreement in Favor of Creditor dated April 4, 2022. The USSBA Secured Claim is $149,345.47.

- **Treatment.**  Following the Effective Date, the USSBA will be paid the full amount of the USSBA Secured Claim, net of any payments made following the Petition Date, in accordance with the terms and conditions of its Pre-Petition Loan Documents (being monthly installments of $683.00). The USSBA will retain its Lien and security interest in Property of Debtor and said Liens and security interests shall be assumed by and encumber such Property of Reorganized Debtor to the same extent and priority as USSBA possessed against Debtor's Property Pre-Petition.

4.2.3    *Class 3 – Interstate Bank Secured Claim*

- **Impairment and Voting.**  Class 3 is Impaired under the Plan.  The Holder of the Class 3 Claim is entitled to vote and accept or reject the Plan.

- **Background.** Interstate Bank and Debtor entered into a series of Pre-Petition Loan Documents for the Interstate Loans, which re-financed pre-existing secured debt of Debtor.   The Interstate Loans were secured by 80 vehicles/tractors and trailers in the Company Fleet.  Following the Petition Date, the Bankruptcy Court entered an Order on June 6, 2024 on an Agreed Motion for Relief from Stay filed by Interstate Bank (Docket No. 52), pursuant to which Debtor surrendered no less than 30 vehicles/tractors and trailers that were not necessary to Debtor's reorganization under this Plan (the "Surrendered Rolling Stock").   Debtor retained 50 vehicles/tractors and trailers (the "Remaining Rolling Stock") for its continued use in its business operations.  Thereafter, Interstate Bank filed Proof of Claim No. 13-1, asserting a Secured Claim in the amount of $1,285,000.00 and a General Unsecured Claim for a deficiency balance owed on the Interstate Loans in the amount of $1,622,160.67.  Based upon Debtor's books and records and an appraisal completed by Debtor's advisors (Ascend), the full value of the Remaining Rolling Stock is no greater than $1,007,000.00.

- **Treatment.**  Following the Effective Date, the Interstate Bank Secured Claim shall be restructured and paid the full value of its Collateral (the Remaining Rolling Stock), being $1,007,000, net of any payments made following the Petition Date on account of the Interstate Bank Secured Claim, through monthly installments amortized over 96 months at the Prime Rate plus one (1) percent per annum (currently 9.5% in total), starting to accrue on the Effective Date.  As of the Effective Date, the initial monthly installments Reorganized Debtor will remit to Interstate Bank on the Interstate Bank Secured Claim will be $15,015.26.

  Interstate Bank will retain its Lien and security interest in Collateral and said Liens and security interests shall be assumed by and encumber such Property of Reorganized Debtor to the same extent and priority as Interstate Bank possessed against Debtor's Property Pre-Petition.  Any Allowed portion of Interstate Bank's Proof of Claim beyond $1,007,000.00 (being $1,285,000.00 – 1,007,000.00 = $278,000.00) shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code.  Payments shall commence on the fifteenth day of the month following the Effective Date and shall be payable on the fifteenth day of each subsequent month thereafter.

### 4.2.4    *Class 4 – Financial Pacific Secured Claim*

- **Impairment and Voting**.  Class 4 is Impaired under the Plan. The Holder of the Class 4 Claim is entitled to vote and accept or reject the Plan.

- **Background**.  Financial Pacific and Debtor entered into certain Pre-Petition Loan Documents in 2023 for the purpose of financing 1 tractor, incurring an interest rate of 20.54% over a term of 48 months. The Financial Pacific Secured Claim is currently secured by a first-priority Lien on the 1 tractor that was obtained through such financing.  Financial Pacific filed Proof of Claim No. 5-1, asserting a Secured

Claim in the amount of $80,750.18.  Based upon Debtor's books and records and an appraisal completed by Debtor's advisors (Ascend), the full value of the tractor is no greater than $39,000.00.

- **Treatment**.  Following the Effective Date, the Financial Pacific Secured Claim shall be restructured and paid the full value of its Collateral, being $39,000.00, net of any payments made following the Petition Date on account of the Financial Pacific Secured Claim, through monthly installments amortized over 48 months at the Prime Rate plus one (1) percent per annum (currently 9.5% in total), starting to accrue on the Effective Date.  As of the Effective Date, the initial monthly installments Reorganized Debtor will remit to Financial Pacific on the Financial Pacific Secured Claim will be $979.80.

  Financial Pacific will retain its Lien and security interest in Collateral and said Liens and security interests shall be assumed by and encumber such Property of Reorganized Debtor to the same extent and priority as Financial Pacific possessed against Debtor's Property Pre-Petition.  Any Allowed portion of Financial Pacific's Proof of Claim beyond $39,000.00 (being $80,750.18 – 39,000.00 = $41,750.18) shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code.  Payments shall commence on the fifteenth day of the month following the Effective Date and shall be payable on the fifteenth day of each subsequent month thereafter.

4.2.5     *Class 5 – BMO Bank Secured Claim*

- **Impairment and Voting**.  Class 5 is Impaired under the Plan.  The Holder of the Class 5 Claim is entitled to vote and accept or reject the Plan.

- **Background**.  BMO Bank and Debtor entered into certain Pre-Petition Loan Documents in 2023 for the purpose of financing a series of vehicles/tractors, incurring an interest rate of 13.22% over a term of 24 months. The BMO Bank Secured Claim is currently secured by a first-priority Lien on the 8 vehicles/tractors that were obtained through such financing.  BMO Bank filed Proof of Claim No. 9-1, asserting a Secured Claim in the amount of $144,751.19.

- **Treatment**.  Following the Effective Date, the BMO Bank Secured Claim shall be restructured and paid the full value of its Secured Claim, being $144,751.19, net of any payments made following the Petition Date on account of the BMO Bank Secured Claim, through monthly installments amortized over 48 months at the Prime Rate plus one (1) percent per annum (currently 9.5% in total), starting to accrue on the Effective Date.  As of the Effective Date, the initial monthly installments Reorganized Debtor will remit to Financial Pacific on the Financial Pacific Secured Claim will be $3,636.60.

BMO Bank will retain its Lien and security interest in Collateral and said Liens and security interests shall be assumed by and encumber such Property of Reorganized Debtor to the same extent and priority as BMO Bank possessed against Debtor's Property Pre-Petition.  Payments shall commence on the fifteenth day of the month following the Effective Date and shall be payable on the fifteenth day of each subsequent month thereafter.

4.2.6    *Class 6 – Citizens Bank Secured Claim*

- **Impairment and Voting**.  Class 6 is Impaired under the Plan.  The Holder of the Class 6 Claim is entitled to vote and accept or reject the Plan.

- **Background**.  Citizens Bank and Debtor entered into certain Pre-Petition Loan Documents in 2023 for the purpose of financing 3 trailers, incurring an interest rate of 17.81% over a term of 48 months. The Citizens Bank Secured Claim is currently secured by a first-priority Lien on the 3 trailers that were obtained through such financing.  Based upon Debtor's books and records, an outstanding balance of $86,376.85 was owed as of the Petition Date pursuant to the Pre-Petition Loan Documents.  Based upon Debtor's books and records and an appraisal completed by Debtor's advisors (Ascend), the full value of the Collateral securing the Citizens Bank Secured Claim (the 3 trailers) is no greater than $75,000.00.

- **Treatment**.  Following the Effective Date, Citizens Bank Secured Claim shall be restructured and paid the full value of its Collateral, being $75,000.00, net of any payments made following the Petition Date on account of the Citizens Bank Secured Claim, through monthly installments amortized over 48 months at the Prime Rate plus one (1) percent per annum (currently 9.5% in total), starting to accrue on the Effective Date.  As of the Effective Date, the initial monthly installments Reorganized Debtor will remit to Financial Pacific on the Financial Pacific Secured Claim will be $1,884.24.

  Citizens Bank will retain its Lien and security interest in Collateral and said Liens and security interests shall be assumed by and encumber such Property of Reorganized Debtor to the same extent and priority as Citizens Bank possessed against Debtor's Property Pre-Petition.  On the Effective Date, any Allowed Claim beyond $75,000 (being $86,376.85 – 75,000.00 = $11,376.85) shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code.  Payments shall commence on the fifteenth day of the month following the Effective Date and shall be payable on the fifteenth day of each subsequent month thereafter.

4.2.7    *Class 7 – Columbia River Secured Claim*

- **Impairment and Voting**.  Class 7 is not Impaired under the Plan.  The Holder of Class 7 Claims is deemed to accept the Plan.

- **Background**. Columbia River and Debtor entered into certain Pre-Petition Loan Documents in 2023 for the purpose of financing 3 vehicles/tractors, incurring an interest rate of 7.38% over a term of 36 months. The Columbia River Secured Claim is currently secured by a first-priority Lien on the 3 vehicles/tractors that were obtained through such financing.  Based upon Debtor's books and records, an outstanding balance of $114,660.98 was owed as of the Petition Date pursuant to the Pre-Petition Loan Documents.

- **Treatment**. Following the Effective Date, Columbia River will be paid the full amount of the Columbia River Secured Claim, net of any payments made following the Petition Date, in accordance with the terms and conditions of its Pre-Petition Loan Documents. As of the Effective Date, the monthly installments Reorganized Debtor will remit to Columbia River on the Columbia River Secured Claim will be $4,755.90.

  Columbia River will retain its Lien and security interest in Collateral and said Liens and security interests shall be assumed by and encumber such Property of Reorganized Debtor to the same extent and priority as Columbia River possessed against Debtor's Property Pre-Petition.

4.2.8    *Class 8 – Daimler Truck Secured Claim*

- **Impairment and Voting**.  Class 8 is not Impaired under the Plan.  The Holder of Class 8 Claims is deemed to accept the Plan.

- **Background**.  Daimler Truck and Debtor entered into certain Pre-Petition Loan Documents in 2023 for the purpose of financing 5 vehicles/tractors, incurring an interest rate of 10.45% over a term of 36 months. The Daimer Truck Secured Claim is currently secured by a first-priority Lien on the 5 vehicles/tractors that were obtained through such financing.  Based upon Debtor's books and records, an outstanding balance of $192.812.30 was owed as of the Petition Date pursuant to the Pre-Petition Loan Documents.

- **Treatment.**  Following the Effective Date, Daimler Truck will be paid the full amount of the Daimler Truck Secured Claim, net of any payments made following the Petition Date, in accordance with the terms and conditions of its Pre-Petition Loan Documents. As of the Effective Date, the monthly installments Reorganized Debtor will remit to Daimler Truck on the Daimler Truck Secured Claim will be $6,305.23.

  Daimler Truck will retain its Lien and security interest in Collateral and said Liens and security interests shall be assumed by and encumber such Property of Reorganized Debtor to the same extent and priority as Daimler Truck possessed against Debtor's Property Pre-Petition.

4.2.9      *Class 9 – Samson Secured Claim*

- **Impairment and Voting**.  Class 9 is Impaired under the Plan and each Holder of a Class 9 Claim that is not Disputed is entitled to vote to accept or reject the Plan.

- **Background**.  The Samson Secured Claim is based upon Claims arising from a certain merchant cash advance lending agreement entered into between Debtor and Samson in 2023 (the "Samson Loan").  Pursuant to the terms of the Samson Loan, Samson asserts its claim is secured based upon a UCC-1 Financing Statement filed at Filing No. 21-0047465150. Based upon Debtor's books and records, an outstanding balance of $310,456.77 was owed to Samson as of the Petition Date. Samson filed Proof of Claim No. 21-1, asserting a Secured Claim in the amount of $334,183.26.

- **Treatment**.  As it relates to the Samson Secured Claim, no Collateral exists that is not otherwise fully unencumbered by Secured Creditors with senior Liens on such Collateral.  As a result, no Collateral exists in Debtor's Estate to be liquidated for the benefit of the Samson Secured Claim.  Therefore, following the Effective Date, the entirety of the Samson Secured Claim (no greater than $334,183.26) shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code.

4.2.10      *Class 10 – Global Merchant Secured Claim*

- **Impairment and Voting**.  Class 10 is Impaired under the Plan and each Holder of a Class 10 Claim that is not Disputed is entitled to vote to accept or reject the Plan.

- **Background**.  The Global Merchant Secured Claim is based upon Claims arising from a certain merchant cash advance lending agreement entered into between Debtor and Global Merchant in 2023 (the "Global Merchant Loan").  Pursuant to the terms of the Global Merchant Loan, Global Merchant asserts its asserts its claim is secured based upon a UCC-1 Financing Statement filed at Filing No. 23-0040519105.  Based upon Debtor's books and records, an outstanding balance of $719,840.12 was owed to Global Merchant as of the Petition Date.   Global Merchant filed Proof of Claim No. 19-1, asserting a Secured Claim in the amount of $739,469.35.

- **Treatment.**  As it relates to the Global Merchant Secured Claim, no Collateral exists that is not otherwise fully unencumbered by Secured Creditors with senior Liens on such Collateral.  As a result, no Collateral exists in Debtor's Estate to be liquidated for the benefit of the Global Merchant Secured Claim. Therefore, following the Effective Date, the entirety of the Global Merchant Secured Claim (no greater than $739,479.35) shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code.

4.2.11    *Class 11 – IRS Secured Claim*

- **Impairment and Voting**.  Class 11 is not Impaired under the Plan.  The Holder of Class 11 Claims is deemed to accept the Plan.

- **Background**.  The IRS filed Proof of Claim No. 4-2 asserting a Secured Claim in the amount of $513,808.17 as result of the filing of the NFTL on April 22, 2024.

- **Treatment**.  The IRS Secured Claim is Disputed.  As it relates to the IRS Secured Claim, no Collateral exists that is not otherwise fully unencumbered by Secured Creditors with senior Liens on such Collateral.  As a result, no Collateral exists in Debtor's Estate to be liquidated for the benefit of the IRS Secured Claim.  However, Debtor acknowledges that the extent of such Claim is a Priority Tax Claim as set forth in Section 4.1.5 of this Plan, which shall be paid in full in accordance with the time period allowed under 11 U.S.C. §1129(a)(9)(c).

4.2.12    *Class 12 – General Unsecured Claims*

- **Impairment and Voting**.  Class 12 is Impaired under the Plan and each Holder of a Class 12 Claim that is not Disputed is entitled to vote to accept or reject the Plan.

- **Background.**  Class 12 consists of all remaining Claims, other than DIP Facility Claim, a Secured Claim, Administrative Claim, Priority Tax Claim, or Other Priority Claim, as the same are Allowed and ordered to be paid by the Bankruptcy Court.  Such Claims include but are not limited to (a) unsecured trade debt incurred prior by Debtor prior to the Petition Date; (b) deficiency balances on financing agreements entered into by Debtor over time; and (c) Claims of Secured Creditors to the extent that the Bankruptcy Court finds that such creditors' Claims are unsecured in whole or in part and are reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code.

    **Treatment**.  Following the Effective Date, Holders of Allowed General Unsecured Claims shall receive a Pro Rata share of Debtor's Disposable Income through a combination of the following under the Plan:

    a) Holders of Allowed General Unsecured Claims will receive a Pro-Rata share of twelve (12) consecutive quarterly payments of $5,000.00 for total payments of $60,000.00. Such payments shall commence on the last Business Day of the month in which the Effective Date occurs and continue thereafter on the last Business Day of each quarter for eleven (11) consecutive quarters.

    b) Holders of Allowed General Unsecured Claims will receive a Pro-Rata share of 5% of the net cash balance, if any, held by Reorganized Debtor on the Effective Date. Such payment will be paid on the last Business Day of the month in which

the Effective Date occurs. There is no guaranty there will be a net cash balance that will result in such payment.

**Example**: If the Effective Date is October 15, 2024, and Reorganized Debtor's net cash balance on October 15, 2024 is $100,000, then the Holder of Allowed General Unsecured Claims is entitled to a Pro-Rata share of $5,000 (i.e., $100,000 x 5% = $5,000). Such payment would be made to Holder of Allowed General Unsecured Claims on October 31, 2024.

c) Holders of Allowed General Unsecured Claims will receive a Pro-Rata share of 5% of the net cash balance, if any, held by Reorganized Debtor on the last Business Day for the twelve (12) consecutive quarters following the month in which the Effective Date occurs. Such payments shall be made on the last Business Day of the month following the end of each quarter. There is no guaranty there will be a net cash balance that will result in such quarterly payment(s).

Debtor projects that Holders of Allowed General Unsecured Claims will yield a recovery of 2-4% on their Allowed Claims pursuant the projected Disposable Income. Payments shall be distributed by Reorganized Debtor directly to the Holders of Allowed General Unsecured Claims as more particularly provided by Sections 6.3 and 9.2 of the Plan.

4.2.13    *Class 13 – Equity Security Interests*

- **Impairment and Voting**. Class 13 is not Impaired under the Plan. The Holder of Class 13 Claims is deemed to accept the Plan.

- **Background.** M&G Transportation Holdings, LLC, a holding company wholly owned by Manuel Gutierrez and German Gutierrez, owns 100% of the Interests of Debtor.

- **Treatment**. On the Effective Date, the Holder of the Equity Security Interests in Debtor shall retain such Interests following the Effective Date.


## ARTICLE V – VOTING PROCESS

5.1    Classes Entitled to Vote.

Pursuant to Sections 1123 and 1126 of the Bankruptcy Code, Classes of creditors who are Impaired under the Plan have the right to vote on the Plan. Section 1124 of the Bankruptcy Code defines impairment under the Bankruptcy Code. The following Classes of Claims are Impaired and entitled to vote on the Plan:

| Class No. | Description |
|---|---|
| 3 | Interstate Bank Secured Claim |
| 4 | Financial Pacific Secured Claim |
| 5 | BMO Bank Secured Claim |
| 6 | Citizens Bank Secured Claim |
| 9 | Samson Secured Claim |
| 10 | Global Merchant Secured Claim |
| 11 | General Unsecured Claims |

In order to confirm the Plan pursuant to Section 1191(a) of the Bankruptcy Code, each Class of Impaired Claims must vote to accept the Plan.

5.2    Voting Process.

Holders of Impaired Claims set forth in Article IV of this Plan will receive with this Plan a Ballot to vote to either accept or reject the Plan.  The Ballot must be returned to counsel for Debtor in the method described on the Ballot by the Voting Deadline.  The Voting Deadline will be set by the Bankruptcy Court at the time the Bankruptcy Court sets the Confirmation Hearing.  The order entered by the Bankruptcy Court to set the Voting Deadline will be sent with this Plan.  **IF YOU WANT YOUR VOTE TO COUNT, YOU MUST RETURN THE COMPLETED AND SIGNED BALLOT TO COUNSEL FOR DEBTOR BY THE VOTING DEADLINE.**

5.3    Tabulation of Votes.

Prior to the Confirmation Hearing, Debtor will file with the Bankruptcy Court the tabulation of votes received and whether each particular Class voted to accept or reject the Plan.  Each Holder of a Claim in an Impaired Class has the right to vote on their Claim in that Class.  To determine whether a Class has accepted or rejected the Plan, more than one half in number and at least two-thirds in amount of such Class of Claims must vote to accept the Plan.  Only those Claim Holders that actually vote are considered in the calculations.  Whether a Holder of an Impaired Claim votes on the Plan or not, each Holder of an Impaired Claim will be bound by the terms and treatments set forth in the confirmed Plan that is accepted by the requisite majorities of Holders of Claims and is confirmed by the Bankruptcy Court, or as confirmed by the Bankruptcy Court pursuant to the provisions of 11 U.S.C. § 1191(b). Absent some affirmative act constituting a vote, a Holder of an Impaired Claim not voting on the Plan will not be included in the tally.  Allowance of a Claim for voting purposes does not necessarily mean that all or a portion of the Claim will be allowed for Distribution purposes.

**YOUR VOTE TO ACCEPT THE PLAN AND THE TREATMENT OF YOUR CLAIM AS SET FORTH HEREIN IS IMPORTANT AND SOLICITED BY DEBTOR.**

**ARTICLE VI – CLAIMS OBJECTION PROCESS**

6.1    <u>Claims Bar Date</u>.

The Bar Date for all creditors, other than Governmental Units, to file Proofs of Claim with the clerk of the Bankruptcy Court was July 24, 2024.  The Bar Date for Governmental Units to file Proofs of Claim with the clerk of the Bankruptcy Court is November 12, 2024.

6.2    <u>Objection Deadline</u>.

Within one hundred twenty (120) days from the Effective Date, unless such date is extended by order of the Bankruptcy Court after notice and hearing, Debtor may file with the Bankruptcy Court objections to Claims and shall serve a copy of each such objection upon the Holder of the Claim to which such objection pertains ("<u>Disputed</u> or <u>Undetermined Claim</u>"). Unless arising from an Avoidance Action, any Proof of Claim filed after the Effective Date shall be of no force and effect and need not be objected to.  Any Disputed or Undetermined Claim may be litigated to Final Order. Debtor may compromise and settle any Disputed or Undetermined Claim without the necessity of any further notice or approval of the Bankruptcy Court, and Bankruptcy Rule 9019 shall not apply to any settlement of a Disputed or Undetermined Claim after the Effective Date.

6.3    <u>Allowance of Claims</u>.

At the time, and to the extent that a Disputed or Undetermined Claim becomes an Allowed Claim, such Allowed Claim shall be entitled to Distributions under the Plan.  Such Distributions shall be made in the manner provided for by this Plan, or any Final Order of the Bankruptcy Court with respect to such Allowed Claim.

**ARTICLE VII – PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

To the extent not previously granted by the Bankruptcy Court, Debtor assumes the following executory contracts and unexpired leases:

| Line No. | Counter-Party | Description | Cure Amount |
|:---:|:---|:---|---:|
| 1 | Micah Geran | S. Washington Street Lease | $0.00 |
| 2 | Wells Fargo Vendor Financial Services, LLC | Copier Lease | $0.00 |

The S. Washington Street Lease relates to Debtor's operating facility in Amarillo, Texas, which consists of an office building and shop, together with a yard for storing its Company Fleet of tractors and trailers when being serviced and not located at a customer's facility or in transit.  The S. Washington Street Lease is a triple net lease with a base rent of $6,600.00 and a term that expires

on December 31, 2026.  When evaluating the location, cost of moving, logistics and proximity to customers and employees, Debtor considers the S. Washington Street Lease a fair market value transaction.  The counter-party to the lease (Micah Geran) is not an Insider of Debtor.

The Copier Lease relates to an office printer/copier utilized by Debtor's operations at its operating facility in Amarillo, Texas.  The material terms of the Copier Lease provide for a monthly charge of $240.71 and a term that expires on May 17, 2026.  The counter-party to such lease (Wells Fargo Vendor Financial Services, LLC) is not an Insider of Debtor.

All other executory contracts or unexpired leases not set forth above shall be deemed rejected as of the Petition Date.  Holders of rejected executory contracts or unexpired leases shall have thirty (30) days from the Effective Date to file a Proof of Claim for any damages arising by the rejection. Failure to file a Proof of Claim for rejection damages within thirty (30) days from the Effective Date shall act as a bar to any late filed Proof of Claim, and Debtor shall not be required to file an objection to the late-filed rejection damages Claim.  Debtor reserves its right to object to any Claims timely filed on account of the rejection of the Claim Holder's executory contract or unexpired lease in accordance with Article VI herein.


## ARTICLE VIII – MEANS FOR IMPLEMENTATION OF THE PLAN

8.1    Continuation of Operations of M&G Transportation, LLC.

Following the Effective Date, Reorganized Debtor will continue and operate the business with its downsized Company Fleet and with the operational and financial improvements implemented with Ascend's assistance.  Through Reorganized Debtor's continued operations, Reorganized Debtor will meet its obligations to creditors under this Plan.

Attached as Exhibit B to this Plan are Debtor's cash flow projections which demonstrate that Reorganized Debtor can make the payments called for under the Plan.  Further, to the extent Debtor seeks the confirmation of the Plan pursuant to Section 1191(b) of the Bankruptcy Code, the cash flow demonstrates Reorganized Debtor will devote its projected Disposable Income over the life of the Plan to the payment of Allowed General Unsecured Claims.  Such payments will be made in accord with the available Disposable Income as determined by the applicable statutory provisions of Subchapter V of Chapter 11 of the Bankruptcy Code.

8.2    Preservation of Causes of Actions and Rights.

All Causes of Action, rights of setoff, and other legal and equitable defenses of Debtor or the Estate are preserved unless expressly released, waived, or relinquished under the Plan or the Confirmation Order, and shall vest in Reorganized Debtor upon the Effective Date of the Plan.  No Person may rely on the absence of a specific reference in the Plan to any Cause of Action against them as an indication that a Cause of Action will not be pursued against them.

**Further, unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such Claims and Causes of Action against third parties are specifically reserved, including but not limited to any such Claims or Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, Avoidance Actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignment of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, breach of fiduciary duty, breach of contract, conversion, aiding and abetting, civil conspiracy, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of Collateral, wrongful release of Collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt re-characterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship including bailment, course of conduct or dealing, obligation of fair dealing, obligation of good faith, malpractice, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

8.3    Representative of the Estate.

On and after the Effective Date, Reorganized Debtor shall be appointed representative of the Estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Causes of Action retained in Section 8.2 of the Plan. Reorganized Debtor may enforce, sue on, and, subject to Bankruptcy Court approval (except as otherwise provided herein), settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action retained pursuant to the Plan. Except as otherwise ordered by the Bankruptcy Court, Reorganized Debtor shall be vested with authority and standing to prosecute the Causes of Action retained pursuant to the Plan. Reorganized Debtor and its attorneys and other Professional advisors shall have no liability for pursuing or failing to pursue any such Causes of Action.

8.4    Post-Effective Date Plan Implementation.

On and after the Effective Date, the Reorganized Debtor is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, in the name of and on behalf of Reorganized Debtor, without the need for any approvals, authorization, or consents, except those expressly required pursuant to the Plan.

8.5    Settlement of Claims and Controversies.

Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for all Distributions under the Plan and other benefits provided under this Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims and controversies relating to the rights that a Holder of a Claim or Interest may have with respect to such Claim or Interest or any Distribution under the Plan on account of thereof. If the Confirmation Order is not entered or the Effective Date does not occur, Debtor reserves its rights with respect to all disputes resolved and settled under this Plan.

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of each compromise and settlement embodied in the Plan, and the Bankruptcy Court's finding that all such compromises and settlements are (a) in Debtor's and Estate's best interests and (b) fair, equitable, and within the range of reasonableness. The provisions of the Plan, including, without limitation, its release, injunction, exculpation, and compromise provisions are mutually dependent.**

8.6    Settlement of Avoidance Actions Against Insiders.

Debtor (prior to the Effective Date) and Reorganized Debtor (from and after the Effective Date) shall retain all Causes of Action Post-Confirmation. Debtor's Causes of Action include (but are not limited to) Avoidance Claims against certain Insiders of Debtor:

      (a) against Manuel Gutierrez for an alleged preferential payment pursuant to Section 547 of the Bankruptcy Code in the amount of $36,000.00; and

      (b) against German Gutierrez for an alleged preferential payment pursuant to Section 547 of the Bankruptcy Code in the amount of $27,000.00.

The alleged payments consisted of installment payments on short-term loans received by Debtor from Manuel Gutierrez and German Gutierrez in order for Debtor to sustain cash flow of its operations in 2023. Manuel Gutierrez and German Gutierrez have each challenged the recovery of such payments and asserted defenses to the avoidability of the payments under Section 547(c) of the Bankruptcy Code.

However, in order to resolve any Claims against Manuel Gutierrez and German Gutierrez for such payments and to avoid the cost, expense, and delay relating to litigation over the same, under the Plan, and only to the extent the Plan is confirmed, Manuel Gutierrez and German Gutierrez have agreed to resolve such Claims with Debtor. Specifically, Manuel Gutierrez shall pay Debtor $25,000.00 through consecutive monthly installment payments of $500.00 per month until paid in full (the "MG Settlement"). Similarly, German Gutierrez shall pay $20,000.00 through consecutive monthly installment payments of $500.00 per month until paid in full (the "GG Settlement"). Manuel Gutierrez and German Gutierrez shall also waive any Distribution on account of any Claim for the MG Settlement and GG Settlement pursuant to Section 502(h) of the Bankruptcy Code. Finally, Manuel Gutierrez and German Gutierrez shall not receive any

other dividends or other Distributions until such time as the obligations of this Plan have been satisfied.

The monthly installment payments for the MG Settlement and GG Settlement shall commence on the first day of the month following the Effective Date and shall be payable on the first day of each subsequent month thereafter.


## ARTICLE IX – EFFECT OF CONFIRMATION OF PLAN AND INJUNCTION

9.1    Effective Date and Notice.

The Effective Date of the Plan is the first Business Day following the date that is thirty (30) days after the Confirmation Order becomes final and non-appealable; provided, however, if an appeal of the Confirmation Order has been taken and a stay of confirmation pending appeal in effect, the Effective Date will be the first Business Day after the date on which the stay expires or is otherwise terminated.

On or before ten (10) Business Days after the occurrence of the Effective Date, Reorganized Debtor shall mail or cause to be mailed to all Holders of Claims and Equity Security Interests a notice that informs such Holders of the following: (a) entry of the Confirmation Order; (b) occurrence of the Effective Date; and (c) such other matters that Reorganized Debtor deems appropriate.

9.2    Binding Effect of Plan.

Upon the Effective Date, the Plan and each of its provisions shall be binding on Reorganized Debtor, all creditors, all Equity Security Interest Holders, and all Persons acquiring Property under the Plan, whether or not they voted to accept the Plan, whether or not they had a right to vote on the Plan, whether or not any Claim or Equity Security Interest held by any of them is Impaired under the Plan, whether or not any Claim or Equity Security Interest held by any of them is Allowed in full, only in part, or Disallowed in full, and whether or not a Distribution is made to any of them under the Plan. This provision includes all successors and assigns of the parties named herein.

9.3    Vesting of Assets.

Upon the Effective Date, all assets of the Estate shall vest in Reorganized Debtor, except as otherwise provided in the Plan.

9.4    Discharge.

In the event this Plan is confirmed under Bankruptcy Code Section 1191(a) of the Bankruptcy Code, as of the Effective Date Debtor will be discharged from any debt that arose before

confirmation of this Plan, to the extent specified in Bankruptcy Code Section 1141(d)(1)(A) of the Bankruptcy Code, except that Debtor will not be discharged of any debt imposed by this Plan.

In the event this Plan is confirmed under Section 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan unless the Bankruptcy Court grants a discharge on completion of all payments due under this Plan, or as otherwise provided in Bankruptcy Code Section 1192 of the Bankruptcy Code.

9.5     Injunction Against Interference with Plan.

Upon the Effective Date, all Holders of Claims, the Holders of Equity Security Interests, and all other parties in interest in the Bankruptcy Case, along with their respective current and former officers, directors, principals, employees, and agents, shall be and are hereby enjoined from taking any action to interfere with the implementation or consummation of the Plan.  Additionally, all Holders of Claims, the Holders of the Equity Security Interests, and all other parties in interest in the Bankruptcy Case shall be enjoined from seeking payment on their Claims or Interest from Reorganized Debtor except as otherwise provided in the Plan, including any Claims for which Debtor's principals may be jointly liable.

9.6     Payments under the Plan.

Regardless of whether Debtor confirms the Plan pursuant to Section 1191(a) or (b) of the Bankruptcy Code, Reorganized Debtor shall make all payments required under the Plan directly to Holders of Claims once such Claim becomes an Allowed Claim.  Debtor asserts that cause exists to allow Reorganized Debtor to make all Plan payments as this will reduce administrative costs and provide assurance Debtor is better able to monitor and maintain its cash flow.


**ARTICLE X – EVENTS OF DEFAULT**

10.1    Events of Default.

   10.1.1    *Failure to Make Payments*

The failure by Reorganized Debtor to make a payment required under the Plan directly to a creditor holding an Allowed Claim on or before the date required under the Plan, and such failure to make a payment remains uncured after Reorganized Debtor has had an opportunity to cure the default as provided for under Section 10.3 of the Plan, shall constitute an event of default under the Plan.

   10.1.2    *Failure to Perform Covenants*

Failure on the part of Reorganized Debtor to perform or observe any covenant set forth in the Plan, and such failure shall remain uncured after Reorganized Debtor has had an opportunity to

cure the default as provided for under Section 10.3 of the of the Plan, shall constitute an event of default.

### 10.1.3    *Failure to Perform other Terms and Provisions of Plan*

Failure on the part of Reorganized Debtor to perform or observe any term or provision set forth in the Plan, and such failure shall remain uncured after Reorganized Debtor has had an opportunity to cure the default as provided for under Section 10.3 of the Plan, shall constitute an event of default.

### 10.2    Notice of Event of Default.

In the event of a default under the Plan, any creditor or party in interest shall provide written notice to Reorganized Debtor and undersigned counsel of such default no later than ten (10) Business Days after the event of default described in Section 10.1 of the Plan ("Notice Deadline"). If any creditor or party in interest fails to notify Reorganized Debtor and undersigned counsel of such default before the expiration of the Notice Deadline, the Holder of such Claim or party in interest shall be deemed to have waived such default.

### 10.3    Opportunity to Cure Default.

### 10.3.1    *Payment Default*

Regardless of whether the Plan is confirmed under Section 1191(a) or 1191(b) of the Bankruptcy Code, Reorganized Debtor shall have twenty (20) Business Days to cure any event of default arising from the failure to make a payment due under the Plan after receipt of a written notice of default complying with Section 10.2 of the Plan.

### 10.3.2    *Non-payment Default*

Regardless of whether the Plan is confirmed under Section 1191(a) or 1191(b) of the Bankruptcy Code, Reorganized Debtor shall have thirty (30) days to cure any event of default that is a non-payment default after receipt of a written notice of default complying with Section 10.2 of the Plan. In the event that a non-payment default cannot be cured within thirty (30) days after receipt of a written notice of default complying with Section 10.2 of the Plan, so long as Reorganized Debtor can demonstrate good faith efforts to cure the non-payment default, Reorganized Debtor shall have an additional thirty (30) days to cure said default. Any additional time after the extension to cure hereunder shall require an order from the Bankruptcy Court.

### 10.4    Creditors' Remedies Upon Event of Default.

Upon the occurrence of an event of default specified in Section 10.1 of the Plan, and after providing written notice of such default in compliance with Section 10.2 of the Plan, and if such default is not cured in accordance with Section 10.3 of the Plan, the creditor or party in interest

may exercise any rights it has against Debtor under the Plan, documents governing the credit relationship between Debtor and the creditor, or federal or state law.

10.5    Debtor's Rights Reserved.

Notwithstanding Sections 10.1 through 10.4 of this Article X, nothing in Article X shall constitute a waiver by Debtor of its rights provided under the Bankruptcy Code to seek a modification of the Plan pursuant to Section 1193 of the Bankruptcy Code or as otherwise provided in Article XI of the Plan.


## ARTICLE XI – MODIFICATIONS OF THE PLAN

11.1    Amendments Prior to Confirmation Date.

Debtor reserves the right to amend or modify the Plan prior to confirmation pursuant to Section 1193(a) of the Bankruptcy Code, and the Plan, as amended, shall become the new Plan.

11.2    Amendments After Confirmation Date.

11.2.1    *Consensual Plan*

If the Plan is confirmed under Section 1191(a) of the Bankruptcy Code, Debtor may amend or modify the Plan before its substantial consummation, provided that the Plan, as amended or modified, meets the requirements of the Bankruptcy Code and the Bankruptcy Court, after notice and hearing, confirms this Plan, as modified.

11.2.2    *Non-consensual Plan*

If the Plan is confirmed under Section 1191(b) of the Bankruptcy Code, Debtor may amend or modify the Plan at any time within three (3) years, or such longer time that does not exceed five (5) years, as fixed by the Bankruptcy Court, provided that the Plan, as amended or modified, meets the requirements of the Bankruptcy Code and the Bankruptcy Court, after notice and hearing, confirms the Plan, as modified.

11.3    Effect on Claims.

A Holder of a Claim that has accepted or rejected under this Plan shall be deemed to have accepted or rejected, as the case may be, this Plan, as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

## ARTICLE XII – RETENTION OF JURISDICTION

12.1   <u>Retention of Jurisdiction</u>.

Notwithstanding entry of an order confirming the Plan, the Bankruptcy Court shall retain jurisdiction over the Bankruptcy Case for the following purposes:

a) determine any and all objections to the allowance of Claims or Equity Security Interests, both before and after the Effective Date;

b) to determine any and all applications for fees and expenses authorized to be paid or reimbursed in accordance with Section 503(b) of the Bankruptcy Code or this Plan;

c) to hear and determine any actions to void or terminate unexpired contracts or leases, and to hear and determine and, if need be, to liquidate any and all Claims arising therefrom;

d) to hear and determine any and all actions initiated by Debtor, whether by motion, complaint, or otherwise;

e) to determine any and all applications, motions, adversary proceedings, and contested matters pending before the Bankruptcy Court on the Effective Date or filed or instituted after the Effective Date;

f) to modify this Plan or any document created in connection with this Plan, or remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, this Plan, or any document created in connection with this Plan, in such manner as may be necessary to carry out the purposes and effects of this Plan to the extent authorized by the Bankruptcy Code;

g) to ensure that the Distributions are accomplished in accordance with the provisions of this Plan;

h) to enter such orders as may be necessary to interpret, enforce, administer, consummate, implement, and effectuate the operative provisions of this Plan, the order confirming the Plan, and all documents and agreements provided for herein or therein or executed pursuant hereto or thereto including, without limitation, entering appropriate orders to protect the Estate from creditor actions;

i) to hear any other matter not inconsistent with Chapter 11 of the Bankruptcy Code;

j) to enter and implement such orders as may be appropriate in the event the order confirming the Plan is for any reason stayed, reversed, revoked, or vacated;

k) to enforce all orders, judgments, injunctions, and rulings entered in connection with the Bankruptcy Case;

l) to determine any actions specifically preserved in the Plan including any and all Claims brought pursuant to Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code; and

m) to enter a final decree closing the Bankruptcy Case.

## 12.2   Exclusive Jurisdiction.

The Bankruptcy Court shall have exclusive jurisdiction to resolve all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, consummation, implementation, or administration of this Plan or the order confirming the Plan, and all entities shall be enjoined from commencing any legal or equitable action or proceeding with respect to such matters in any other court or administrative or regulatory body.

## 12.3   Abstention.

If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Bankruptcy Case, including the matters set forth in this Article XII, then this Article XII shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## 12.4   Rights of Debtor.

Nothing contained in this Article XII shall be construed so as to limit the rights of Debtor (or Reorganized Debtor) to commence or to prosecute any Cause of Action in any court of competent jurisdiction.

## ARTICLE XIII – GENERAL PROVISIONS

## 13.1   Certain Rights Unaffected.

Except as otherwise provided herein, any rights or obligations which the creditors may have among themselves as to their respective Claims or the relative priority or subordination thereof are unaffected by this Plan.

## 13.2   Incorporation of Valuation Motion.

To the extent necessary to effectuate and implement the provisions of this Plan, the Plan shall be deemed to constitute a motion for valuation under the Bankruptcy Code, including the value of any Lien, security interest, or encumbrance treated by this Plan; provided, however, that nothing in this Plan shall alter any valuation ordered by Final Order of the Bankruptcy Court in the Bankruptcy Case.

13.3    Automatic Stay.

The automatic stay provided in Section 362 of the Bankruptcy Code shall remain in effect through the Effective Date, unless otherwise specifically modified, annulled, or terminated by the Bankruptcy Court pursuant to a separate order, and shall terminate on the Effective Date unless the Plan is confirmed under Section 1191(b).

13.4    Reservation of Rights.

The Plan shall have no force or effect unless and until the Effective Date occurs.  Prior to the Effective Date, the filing of the Plan, any statement or provision contained in the Plan, or action taken by Debtor with respect to the Plan shall not be, or shall not be deemed to be, an admission or waiver of any rights of Debtor or any other party with respect to any Claims or Equity Security Interests or any other matter.

13.5    Rights under Section 1191(b) of the Bankruptcy Code.

In the event Debtor is unable to get all Impaired Classes of creditors to vote in favor of the Plan, Debtor will seek for the Bankruptcy Court to confirm the Plan pursuant to Section 1191(b) of the Bankruptcy Code (commonly referred to as a "cram down" plan).  Debtor hereby gives notice of its intent to seek confirmation under Section 1191(b) of the Bankruptcy Code, if necessary.

13.6    Headings.

The headings used in this Plan are inserted for convenience and reference only; they do not constitute a part of this Plan, nor in any manner affect the terms, provisions, or interpretations of this Plan.

13.7    Severability.

If any term or provision in this Plan is determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other term or provision of this Plan.

13.8    Governing Law.

Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan and any documents, agreements, and instruments executed in connection with this Plan (except to the extent such documents, agreements, and instruments designate otherwise) shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas.

13.9    Compliance with Regulations of the Office of the U.S. Trustee.

During the pendency of this Proceeding, Debtor will comply with all regulations promulgated by the Office of the U.S. Trustee.  Upon confirmation of the Plan, and until a final decree is entered

in the Bankruptcy Case, Debtor shall file any and all reports required by the Federal Rules or Bankruptcy Procedure or order of this Court.

[SIGNATURE PAGE FOLLOWS]

Dated:  August 13, 2024

Respectfully submitted,
CAROTHERS & HAUSWIRTH LLP
FORSHEY & PROSTOK LLP

*/s/ Harrison A. Pavlasek*
Harrison A. Pavlasek
State Bar No. 24126906
777 Main St., Suite 1550
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
hpavlasek@forsheyprostok.com

*Attorneys for Debtor, M&G Transportation, LLC*

-and-

*/s/ Gregory W. Hauswirth*
Patrick W. Carothers (PA ID No. 85721)*
Gregory W. Hauswirth (PA ID No. 307482)*
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA  15220
Telephone:  412-910-7500
Facsimile:  412-910-7510
pcarothers@ch-legal.com
ghauswirth@ch-legal.com

* *Admitted pro hac vice*

*Attorneys for Debtor, M&G Transportation, LLC*

## EXHIBIT A

**M&G Transportation, LLC**
**LIQUIDATION ANALYSIS**
As of 08/01/2024

| | Notes | Book values (BV) | | Forced Liquidation Value - Low | | Forced Liquidation Value - High | Average Recovery Value |
|---|---|---|---|---|---|---|---|
| **Cash** | | 71,774 | 100% | 71,774 | 100% | 71,774 | 71,774 |
| **Accounts Receivable** | | | | | | | |
| Open Accounts Receivable | | 50,000 | 60% | 30,000 | 85% | 42,500 | 36,250 |
| Allowance for doubtful accounts | | (2,500) | | (1,500) | | (2,000) | (1,750) |
| Total Accounts Receivable | | 47,500 | | 28,500 | | 40,500 | 34,500 |
| **Prepaid Expenses and deposits** | | | | | | | |
| Personal Property | | 4,070 | 0% | 0 | 100% | 4,070 | 2,035 |
| Professional Retainers | | 5,000 | 100% | 5,000 | 100% | 5,000 | 5,000 |
| Total Prepaid Expenses and deposits | | 9,070 | | 5,000 | | 9,070 | 7,035 |
| **Other Assets** | | | | | | | |
| Class 3 - Interstate Bank Collateral (Vehicles/Trailers) | | 1,007,000 | 60% | 604,200 | 80% | 805,600 | 704,900 |
| Class 4 - Financial Pacific Collateral (Vehicles/Trailers) | | 39,000 | 60% | 23,400 | 80% | 31,200 | 27,300 |
| Class 5 - BMO Bank Collateral (Vehicles/Trailers) | | 160,000 | 60% | 96,000 | 80% | 128,000 | 112,000 |
| Class 6 - Citizens Bank (Vehicles/Trailers) | | 75,000 | 60% | 45,000 | 80% | 60,000 | 52,500 |
| Class 7 - Columbia River Collateral (Vehicles/Trailers) | | 120,000 | 60% | 72,000 | 80% | 96,000 | 84,000 |
| Class 8 - Daimler Truck Collateral (Vehicles/Trailers) | | 200,000 | 60% | 120,000 | 80% | 160,000 | 140,000 |
| Total Other Assets | | 1,601,000 | | 960,600 | | 1,280,800 | 1,120,700 |
| **ASSETS AVAILABLE FOR DISTRIBUTION** | | | | | | | **1,234,009** |
| **Secured Claims** | | | | | | | |
| **Class 1 - Triumph Secured Claim** | | Unliquidated | | | | | |
| **Class 2 - USSBA Secured Claim** | | 149,841 | | | | | |
| **Class 3 - Interstate Bank Secured Claim** | | 1,007,000 | | | | | |
| **Class 4 - Financial Specific Secured Claim** | | 39,000 | | | | | |
| **Class 5 - BMO Bank Secured Claim** | | 144,751 | | | | | |
| **Class 6 - Citizens Bank Secured Claim** | | 75,000 | | | | | |
| **Class 7 - Columbia River Secured Claim** | | 114,660 | | | | | |
| **Class 8 - Daimler Truck Secured Claim** | | 192,812 | | | | | |
| **ASSETS AVAILABLE FOR CHAPTER 7 EXPENSES** | | | | | | | |
| **Chapter 7 Expenses** | | | | | | | |
| Chapter 7 Trustee fees and expenses | | 0 | | | | | 0 |
| Post-Petition Taxes Payable | | 0 | | | | | 0 |
| Payroll Payable | | 0 | | | | | 0 |
| **Subtotal** | | **0** | | | | | **0** |

**COMPARISON OF RETURN THROUGH LIQUIDATION ANALYSIS VS. PLAN FOR IMPAIRED CLASSES**

| | *Projected Percentage of Claims Which Holders of Allowed Claims Would Receive Or Retain in a Chapter 7 Liquidation* : | *Projected Percentage of Claims Which Holders of Allowed Claims Would Receive Under the Plan* |
|---|---|---|
| **Class 2 - USSBA Secured Claim** | 76% | 100% |
| **Class 3 - Interstate Bank Secured Claim** | 70% | 100% |
| **Class 4 - Financial Specific Secured Claim** | 70% | 100% |
| **Class 5 - BMO Bank Secured Claim** | 77% | 100% |
| **Class 6 - Citizens Bank Secured Claim** | 70% | 100% |
| **Class 7 - Columbia River Secured Claim** | 73% | 100% |
| **Class 8 - Daimler Truck Secured Claim** | 73% | 100% |
| **Class 11 - IRS Secured Claim** | 0% | 100% |
| **Class 12 - General Unsecured Claims** | 0% | 2-4% |

**EXHIBIT B**

**M&G TRANSPORTATION LLC - FEASIBILITY ANALYSIS**
**36 Month Projections**

| Line # | Description | 1 Oct-24 | 2 Nov-24 | 3 Dec-24 | 4 Jan-25 | 5 Feb-25 | 6 Mar-25 | 7 Apr-25 | 8 May-25 | 9 Jun-25 | 10 Jul-25 | 11 Aug-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Opening Cash | 80,000.00 | 82,452.12 | 63,030.19 | 75,482.31 | 83,934.43 | 75,438.39 | 98,890.51 | 118,842.63 | 110,101.18 | 135,053.30 | 155,505.42 |
| 2 | Settlement of Avoidance Claims (MG Settlement and GG Settlement) | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| 3 | Collections on Revenue | 700,000.00 | 700,000.00 | 700,000.00 | 700,000.00 | 700,000.00 | 700,000.00 | 700,000.00 | 700,000.00 | 700,000.00 | 700,000.00 | 700,000.00 |
| 4 | Total Cash Receipts | 701,000.00 | 701,000.00 | 701,000.00 | 701,000.00 | 701,000.00 | 701,000.00 | 701,000.00 | 701,000.00 | 701,000.00 | 701,000.00 | 701,000.00 |
| 5 | | | | | | | | | | | | |
| 6 | CASH DISBURSEMENTS | | | | | | | | | | | |
| 7 | | | | | | | | | | | | |
| 8 | Payroll (Company Drivers) | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 |
| 9 | Owner Operator - Fees | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 | 75,000.00 |
| 10 | Carrier Pay | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 | 90,000.00 |
| 11 | Office/Shop Payroll | 55,000.00 | 55,000.00 | 55,000.00 | 55,000.00 | 55,000.00 | 55,000.00 | 55,000.00 | 55,000.00 | 55,000.00 | 55,000.00 | 55,000.00 |
| 12 | Officer Payroll | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 |
| 13 | Payroll taxes | 28,508.00 | 28,508.00 | 28,508.00 | 28,508.00 | 28,508.00 | 28,508.00 | 28,508.00 | 28,508.00 | 28,508.00 | 28,508.00 | 28,508.00 |
| 14 | Loading/Unloading | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 |
| 15 | Stop-Off Comp | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| 16 | Tolls | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 |
| 17 | Scales | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 |
| 18 | Fuel | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 |
| 19 | Diesel Exhaust Fluid (DEF) | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 |
| 20 | Parking | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| 21 | ELD | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 |
| 22 | Dropped Trailers | | | | | | | | | | | |
| 23 | Vehicle Repairs / Maintenance | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 |
| 24 | Building Rent | | | | | | | | | | | |
| 25 | Bank Fees | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 |
| 26 | Advertising & Promotion | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| 27 | Building Maint & Repairs | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 |
| 28 | Claims-Cargo | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 29 | Cleaning & Janitorial | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 |
| 30 | Computer Software | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 |
| 31 | Drug Testing | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 |
| 32 | Dues & Subscriptions | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 |
| 33 | Fuel Tax Expense - State | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 |
| 34 | Insurance - Auto | 50,756.98 | 50,756.98 | 50,756.98 | 50,756.98 | 50,756.98 | 50,756.98 | 50,756.98 | 50,756.98 | 50,756.98 | 50,756.98 | 50,756.98 |
| 35 | Gas (Utilities) | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 |
| 36 | Insurance (workers comp, general) | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 |
| 37 | Office Expense | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 |
| 38 | Telephone Expense | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 |
| 39 | Postage and Delivery | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 |
| 40 | Professional Fees | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 |
| 40 | Triumph - Factor Fees | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 | 6,300.00 |
| 41 | Legal Counsel - Administrative Claims | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | | | | | | | |
| 42 | Financial Advisor - Administrative Claim | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | | | | | |
| 43 | SubChapter V Trustee - Administrative Claim | 1,000.00 | 1,000.00 | 1,000.00 | | | | | | | | |
| 44 | Priority Tax Claims (Quarterly Payment) | | 27,751.44 | | | 27,751.44 | | | 27,751.44 | | | 27,751.44 |
| 45 | Class 2 - USSBA Secured Claim | 683.00 | 683.00 | 683.00 | 683.00 | 683.00 | 683.00 | 683.00 | 683.00 | 683.00 | 683.00 | 683.00 |
| 46 | Class 3 - Interstate Bank Secured Claim | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 |
| 47 | Class 4 - Financial Specific Secured Claim | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 |
| 48 | Class 5 - BMO Bank Secured Claim | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 |
| 49 | Class 6 - Citizens Bank Secured Claim | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 |
| 50 | Class 7 - Columbia River Secured Claim | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 |
| 51 | Class 8 - Daimler Truck Secured Claim | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 |
| 52 | Class 11 - General Unsecured Claims (Disposable Income) | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 | 4,950.00 |
| 53 | Disputed Claims Reserve Account | 10,000.00 | 4,122.61 | | 5,000.00 | 4,196.72 | | 5,000.00 | 5,942.13 | | 5,000.00 | 7,850.27 |
| 54 | Total Cash Disbursements | 698,547.88 | 720,421.93 | 688,547.88 | 692,547.88 | 709,496.04 | 677,547.88 | 681,047.88 | 709,741.45 | 676,047.88 | 681,047.88 | 711,649.59 |
| 55 | | | | | | | | | | | | |
| 56 | Ending Balance - Cash | 82,452.12 | 63,030.19 | 75,482.31 | 83,934.43 | 75,438.39 | 98,890.51 | 118,842.63 | 110,101.18 | 135,053.30 | 155,505.42 | 144,855.83 |
| | Net Cash Yield | 2,452.12 | (19,421.93) | 12,452.12 | 8,452.12 | (8,496.04) | 23,452.12 | 19,952.12 | (8,741.45) | 24,952.12 | 19,952.12 | (10,649.59) |

| 12 Sep-25 | 13 Oct-25 | 14 Nov-25 | 15 Dec-25 | 16 Jan-26 | 17 Feb-26 | 18 Mar-26 | 19 Apr-26 | 20 May-26 | 21 Jun-26 | 22 Jul-26 | 23 Aug-26 | 24 Sep-26 | 25 Oct-26 | 26 Nov-26 | 27 Dec-26 | 28 Jan-27 | 29 Feb-27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 144,946.83 | 168,840.03 | 169,342.01 | 130,523.27 | 145,007.62 | 145,832.92 | 117,723.46 | 123,903.46 | 124,073.66 | 97,004.87 | 102,679.77 | 103,554.87 | 76,928.02 | 87,753.82 | 93,183.82 | 72,415.21 | 82,846.21 | 88,272.21 |
| 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| 700,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 |
| 701,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 |
| 50,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 |
| 75,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 |
| 90,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 |
| 55,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 |
| 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 |
| 28,508.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 |
| 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 |
| 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 |
| 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 |
| 180,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 |
| 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 |
|  | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 | 450.00 |
| 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 |
| 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 |
| 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 |
| 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 |
|  | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 |
| 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 |
| 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 |
| 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 |
| 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 |
| 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 |
| 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 |
| 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 |
| 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 |
| 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 |
| 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 |
| 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 |
| 6,300.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 |
| 683.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  | 26,540.41 |  |  | 26,540.41 |  |  | 26,540.41 |  |  | 26,540.41 | 26,540.41 |  | 26,540.41 |  |  | 26,540.41 |
| 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 |
| 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 |
| 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 |
| 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 |
| 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 | 4,755.90 |  |  |  |  |  |  |  |
| 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 |  | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 |
| 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 7,294.15 | 5,000.00 | 5,000.00 | 6,203.68 |  | 5,000.00 | 5,167.74 |  | 5,000.00 | 4,659.19 |  | 5,000.00 | 4,413.86 |
| 8,442.00 | 8,442.00 | 8,442.00 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| 677,290.90 | 725,324.90 | 755,307.31 | 720,324.90 | 725,324.90 | 754,159.46 | 720,324.90 | 725,324.90 | 753,068.89 | 720,324.90 | 725,324.90 | 752,033.05 | 715,569.00 | 720,569.00 | 746,768.60 | 715,569.00 | 720,569.00 | 746,523.27 |
| 23,709.10 | (23,307.31) | (29,307.31) | 675.10 | 675.10 | (28,159.46) | 5,675.10 | 675.10 | (27,068.89) | 5,675.10 | 675.10 | (26,033.05) | 10,431.00 | 5,431.00 | (20,768.60) | 10,431.00 | 5,431.00 | (20,523.27) |
| 161,164.33 | 168,840.03 | 139,532.72 | 145,007.82 | 145,832.92 | 117,723.46 | 123,398.56 | 124,073.66 | 97,004.87 | 102,679.77 | 103,354.87 | 77,321.82 | 87,752.82 | 93,183.82 | 72,415.21 | 82,846.21 | 88,277.21 | 67,753.94 |

| | 30 Mar-27 | 31 Apr-27 | 32 May-27 | 33 Jun-27 | 34 Jul-27 | 35 Aug-27 | 36 Sep-27 |
|---|---|---|---|---|---|---|---|
| | 67,763.94 | 78,764.74 | 83,325.74 | 63,325.74 | 73,765.74 | 79,187.74 | 59,118.94 |
| | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 |
| | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 | 725,000.00 |
| | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 | 726,000.00 |
| | | | | | | | |
| | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 |
| | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 | 80,000.00 |
| | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 | 95,000.00 |
| | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 |
| | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 | 21,250.00 |
| | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 | 32,000.00 |
| | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 |
| | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 |
| | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 | 4,400.00 |
| | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 | 1,600.00 |
| | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 | 195,000.00 |
| | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 |
| | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 |
| | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 |
| | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 |
| | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 |
| | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 | 6,600.00 |
| | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 |
| | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 | 830.87 |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 | 480.00 |
| | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 | 5,762.00 |
| | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 |
| | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 |
| | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 | 1,320.00 |
| | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 | 52,000.00 |
| | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 |
| | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 | 760.00 |
| | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 | 650.00 |
| | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 | 920.00 |
| | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 |
| | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 |
| | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 | 6,525.00 |
| | | | | | | | |
| | | | 26,540.41 | | | 26,540.41 | |
| | | | | | | | |
| | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 | 15,015.26 |
| | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 | 979.80 |
| | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 | 3,636.60 |
| | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 | 1,884.24 |
| | | | | | | | |
| | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 | 6,305.23 |
| | 5,000.00 | 4,180.80 | | | 5,000.00 | 3,959.39 | |
| | 715,569.00 | 720,569.00 | 746,290.21 | 715,569.00 | 720,569.00 | 746,068.80 | 715,569.00 |
| | 10,431.00 | 5,431.00 | (20,290.21) | 10,431.00 | 5,431.00 | (20,068.80) | 10,431.00 |
| | 78,764.94 | 83,615.94 | 63,325.74 | 73,765.74 | 79,187.74 | 59,118.94 | 69,549.94 |

**EXHIBIT C**

Harrison A. Pavlasek
State Bar No. 24126906
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
hpavlasek@forsheyprostok.com

*Proposed Attorneys for Debtor, M&G Transportation,
LLC*

Patrick W. Carothers (PA ID No. 85721)*
Gregory W. Hauswirth (PA ID No. 307482)*
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA  15220
Telephone:  412.910.7500
Facsimile:  412.910.7510
pcarothers@ch-legal.com
ghauswirth@ch-legal.com

*\*pro hac vice pending*

*Proposed Attorneys for Debtor, M&G Transportation,
LLC*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| M&G Transportation, LLC, | ) Bankruptcy Case No. 24-20129 |
| | ) |
| Debtor. | ) |
| | ) |

**DECLARATION OF MANUEL GUTIERREZ**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Manuel Gutierrez hereby declare under penalty of perjury:

1.      My name is Manuel Gutierrez.  I am 36 years old, and competent to make this declaration (this "Declaration"), given my personal knowledge of the facts as stated in this Declaration.

2.      I am the President of M&G Transportation, LLC ("M&G," or "Debtor").  On May 15, 2024 (the "Petition Date"), M&G filed for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C §§ 101-1501 et seq. (the "Bankruptcy Code") (the "Chapter 11 Case") (Docket No. 1).

3.      I submit this Declaration in support of Debtor's petition and various contemporaneously filed pleadings and requests for relief in the form of motions (each a "First

Declaration of Manuel Gutierrez in Support
of Chapter 11 Petition and First Day Motions.

1

Day Motion" and collectively the "First Day Motions")[1], as well as to assist this Court and other
interested parties in understanding the circumstances that compelled the Chapter 11 Case.

4.       Except as otherwise indicated, the facts set forth in this Declaration are based upon
my personal knowledge, my review of relevant documents, information provided to me by the
employees working under my supervision, or my opinion based upon experience, knowledge and
information concerning the operations of M&G and its industry. References to the Bankruptcy
Code, the chapter 11 process, and related legal matters are based on my understanding of such as
explained to me by counsel.   If called upon to testify, I would testify competently to the facts set
forth in this Declaration.

## I.       Information Concerning the Nature of Debtor's Business and Statement of the Circumstances Leading to Debtor's Chapter 11 Case

5.       M&G is a freight transportation company providing regional, long-haul and coast
to coast transportation for refrigerated products.   M&G is led by my brother German Gutierrez
(age 30) and myself, who grew up in the footsteps of our father, a truck driver that took us on the

---

[1] The First Day Motions consist of:

a)   *Debtor's Emergency Motion for an Interim Order Authorizing  to (I) Maintain and Continue to Operate Under Factoring and Security Agreement in Order to Sell Accounts Post-Petition to Triumph Financial Services, LLC Pursuant to 11 U.S.C Section 363(b), (c), (f) AND (m); (II) Obtain Credit from Triumph Financial Services, LLC Pursuant to 11 U.S.C. Sections 364(c)(1), (c)(2), & (d)(1); (III) Grant Triumph Financial Services LLC Adequate Protection in the Form of First Priority Liens and Security Interests on Property of Debtor's Estate Pursuant to 11 U.S.C. Sections 361 and 363(e)*; *(IV) Modify the Automatic Stay; and (V) Grant Related Relief Retroactively to the Petition Date* [Docket No. 7] (the "DIP Motion");

b)   *Debtor's Emergency Motion for Entry of an Order Authorizing Use of Cash Collateral on an Interim Basis and to Set Final Hearing* [Docket No. 6] ("Cash Collateral Motion");

c)   *Debtor's Emergency Motion For Entry of An Order Authorizing Debtor to: (I) Pay Pre-Petition Accrued Employee Wages, Salaries and Employee Compensation; and (II) Granting Related Relief* [Docket No. 4] (the "Wage Motion"); and

d)   *Debtor's Emergency Motion for Entry of An Order Authorizing Payment of Pre-Petition Independent Contractor Obligations* [Docket No. 5] (the "Independent Contractor Motion").

**Declaration of Manuel Gutierrez in Support**
**of Chapter 11 Petition and First Day Motions.**

road throughout our childhood.  In 2016, German and I formed M&G, starting with one truck driven by ourselves to haul regional groceries.  M&G now employs 25 full-time employees in the greater Amarillo community and subcontracts with approximately 16 full-time independent drivers to deliver its customers' freight requirements.

6.      Between 2016 and 2020, M&G grew by solely servicing outbound freight loads for Affiliated Food, Inc., which was brokered through Jax Transport, LLC ("Jax"). In 2020, a dispute arose between M&G and Jax concerning competition.  M&G elected to part ways with Jax after Jax withheld fees that were owed to M&G for the services it performed.

7.      As M&G broke away from Jax in 2020, a number of owner-operators that previously drove for Jax followed and began driving for M&G.  At that time, M&G had 8 of its own trucks and close to 40 owner-operators that would service routes for M&G.

8.      Over time, M&G increased its fleet substantially.  The fleet grew to approximately 81 company-owned trucks and trailers (the "Company Fleet"), as well as approximately 25 leased trucks and trailers (the "Leased Fleet"), that were leased through Penske Truck Leasing Co., L.P ("Penske") and Mack Financial Services ("Mack").

9.      During this time (2020-2022), the Company Fleet was purchased through a series of acquisitions, which were financed through arrangements between M&G and various equipment financing companies, including Alladin Capital, Inc., Daimler Truck Financial, Interstate Bank ("Interstate"), Happy State Bank ("Happy State"), Hereford Credit Union and Triumph Financial Services, LLC f/k/a Advance Business Capital LLC d/b/a Triumph Business Capital ("Triumph"). The monthly debt service on such loans exceeded $45,000.00 per month.

10.      M&G's expansion was the product of the substantial work ethic of my brother and I; an earned reputation of superior performance; and our geographically favorable location.

**Declaration of Manuel Gutierrez in Support
of Chapter 11 Petition and First Day Motions.**

3

Unfortunately, our lack of fundamental business experience given our relative youth – both in terms of our actual ages and the age of our business – prevented us from anticipating the need for working cash as we expanded.  As a direct result, M&G gradually lacked the ability to pay its operating expenses on time as it grew.  Faced with the reality of losing the ability to sustain its operations if it failed to pay its operating expenses, M&G needed cash.  Most of the sources of cash proved to be expensive.

11.     First, on or about August 1, 2020, M&G obtained a small working capital loan ($140,000.00) from the U.S. Small Business Administration through its economic injury disaster loan program (the "EIDL Loan").

12.     Shortly thereafter, M&G began factoring its accounts receivable through Triumph. Specifically, on October 12, 2020, M&G entered into a Factoring and Security Agreement with Triumph (the "2020 Factoring Agreement") pursuant to which M&G had the ability to sell its qualifying accounts receivable to Triumph.  Under this arrangement, Triumph would purchase qualifying accounts receivable at the rate of 98% of the face amount, plus certain fees.  M&G continues to utilize this arrangement through the Petition Date to monetize between 85 and 90% of its overall accounts receivable.

13.     While tight, M&G realized levels of profitability through the end of 2021, while producing $16.2 million of revenue.

14.      By 2022, M&G further expanded and grew its revenues to an annual best of $18.6 million.  However, the corresponding need for cash to pay expenses increased and M&G yet again needed sources.  Initially, to obtain relief, M&G re-financed all debt relating to the Company Fleet with Happy State (the "Happy State Loan"), reducing the monthly debt service on the Company Fleet to $33,500.00 per month.

**Declaration of Manuel Gutierrez in Support
of Chapter 11 Petition and First Day Motions.**

4

15.     In addition, M&G began to delay the remittance of its payroll tax obligation to the
United States Internal Revenue Service (the "IRS").  Between the fourth quarter of 2022 and the
second quarter of 2023, M&G failed to remit approximately $525,000.00 in payroll taxes (the "941
Obligations").   While M&G is now current on its payroll taxes, the 941 Obligations remain
outstanding, along with further interest and penalties.

16.     Beginning in late 2022 and in the first half of 2023, M&G sought better terms on
the debt relating to the Company Fleet and this time re-financed the Happy State Loan.  To that
end, M&G entered into a series of loans with Interstate (the "Interstate Loans"), which were
evidenced through various loan agreements, promissory notes, security agreements, consensual
liens, and personal guaranties executed by my brother German and myself.  As of April 9, 2024,
Interstate asserted an aggregate balance of $3,179,457.23 on the Interstate Loans (the "Interstate
Debt").

17.     Further, M&G borrowed $461,000.00 from Samson MCA, LLC (the "Samson
Loan") and $595,000.00 from Global Merchant Cash, Inc. ("Global Merchant Loan", and together
with the Samson Loan, the "Merchant Loans").   The obligations under the Merchant Loans
required weekly debt service payments in excess of $23,000.00, which was debited directly from
the bank accounts of M&G.

18.     While M&G was struggling to work through its cash issues, late in 2022 it began
to experience some industry issues.  Specifically, as 2022 came to a close a significant reduction
in the per-mile rates paid to trucking companies occurred due to an oversaturated market of drivers
(up to $0.50/per mile).  As a direct result, revenue levels fell by 15% in 2023.  Despite its efforts
M&G was unable to reduce its operating costs in a corresponding manner.  This led to an inability

Declaration of Manuel Gutierrez in Support
of Chapter 11 Petition and First Day Motions.

5

by M&G to service all of its operational obligations and its now substantial debt service obligations to Interstate, the IRS on the 941 Obligations, and the Merchant Lenders.

19.     In August 2023, M&G sought the assistance of Ascend Business Services, LLC ("Ascend"), and specifically its Director of Workout and Restructuring, Roger Ferrante. Ascend engaged in a global review of the business operations of M&G. Ascend determined that M&G needed to downsize substantially in order to be profitable. It was determined that M&G had a multitude of trucks and trailers that were not being utilized or were substantially underutilized. It was imperative in Ascend's view that such trucks and trailers be essentially liquidated – meaning returned to the party that leased or financed such trucks and trailers, and otherwise sold. If M&G did this, Ascend determined that M&G could produce approximately $10 million in annual revenue with the downsized fleet. Ascend further concluded that M&G could be profitable at this revenue level, provided that M&G only paid its germane operating expenses going forward, debt service on fair market value of the trucks and trailers it was going to retain and utilize, the debt service owed on the EIDL Loan, and the 941 Obligations – as well as a very limited payment stream to unsecured creditors, which included the Merchant Lenders, deficiencies owed to financing companies on account of returned trucks and trailers, and the unsecured portion of debt owed to Interstate.

20.     To that end, M&G took the following acts:

a.  M&G surrendered the Leased Fleet back to Penske & Mack;

b.  M&G ceased payment on the Merchant Loans;

c.  M&G proposed a settlement to the IRS which included payments of $60,000.00 per annum via installments of $5,000 per month on the 941 Obligations (the "IRS Proposal"); and

Declaration of Manuel Gutierrez in Support
of Chapter 11 Petition and First Day Motions.

6

    d.   M&G proposed to restructure the Interstate Loans by immediately surrendering 31 units of the Company Fleet for the benefit of Interstate (the "<u>Surrendered Fleet</u>") and retaining 50 units of the Company Fleet in its operations on a go-forward basis (the "<u>Retained Fleet</u>").  As the Retained Fleet only has a fair market value of $1,007,000.00, M&G desired to begin to re-finance such obligation to account for the reality of Interstate's secured position.  In the short term, M&G proposed that it pay Interstate monthly interest-only installments of $14,166.67 over a period of two years at 8.5%, on a reduced indebtedness of $2,000,000.  At the end of two years, a balloon payment would have been due (collectively, the "<u>Interstate Deal</u>").

21.    While M&G had hoped to arrive at a consensual plan with its creditors, whereby the realities of the situation were taken into account and appropriate deals were cut, M&G soon realized such an out of court solution was not feasible.  Interstate rejected the Interstate Deal and refused to agree to take any reduction to the overall indebtedness.  Rather, Interstate demanded that it be paid $83,405.00 in accrued interest as of April 1, 2024, in order to forbear its rights for a 90 day time-frame, with no promise for future concessions.  The IRS never formally responded to the IRS Proposal (although the $5,000 monthly installments were made by M&G to the IRS in the interim).  On April 22, 2024, the IRS recorded the NFTL in the State of Texas.  Upon learning of the recording of the NFTL, Triumph immediately informed M&G that it could not continue the 2020 Factoring Agreement if action was not taken by M&G to either remove the NFTL or otherwise obtain a subordination agreement from the IRS in favor of Triumph.

22.    Given these facts and circumstances, M&G was advised it could best accomplish its goal of surviving as a going concern and effectuating Ascend's plan through a chapter 11

Declaration of Manuel Gutierrez in Support
of Chapter 11 Petition and First Day Motions.

7

bankruptcy process.  To that end, commencing this Chapter 11 Case was the most prudent business decision.

## II.    Debtor's Chapter 11 Plan of Reorganization

23.    Debtor desires to promptly file a Chapter 11 Plan of Reorganization (the "<u>Plan</u>") in this Chapter 11 Case.  In the short term, Debtor needs to continue the 2020 Factoring Agreement with Triumph where it is able to continue to sell a large portion of its eligible accounts receivable to Triumph to obtain its necessary working cash.  Triumph is willing to continue the 2020 Factoring Agreement under certain terms and conditions set forth in the DIP Motion.  Further, Debtor has certain current accounts receivable that it desires to sell to Triumph and a small portion of accounts receivable that are not eligible for sale to Triumph that makes up a portion of its normal cash flow.  Debtor needs to continue to utilize such cash in the normal course of its business.  Debtor seeks the use of that cash in the Cash Collateral Motion.  Finally, it is imperative that Debtor's employees and independent contractors that drive Debtor's trucks are paid their pre-petition wages and contractor payments.  To that end, Debtor has filed the Wage Motion and the Independent Contractor Motion.  If the First Day Motions are granted, Debtor will be able to operate in a stabilized manner as set forth in its budget relating to its proposed expenditures over the next thirteen (13) weeks which reflects the sources and uses of its funds (the "<u>Budget</u>"), as prepared by Ascend.  A true and correct copy of the Budget is attached hereto as <u>Exhibit A</u>.

24.    At this juncture, within 60 days Debtor will propose its Plan, utilizing many of the features of the Budget and appropriate treatment under the Bankruptcy Code for the EIDL Loan, the 941 Obligations, the Interstate Debt and unsecured creditors.  Debtor submits that the Plan will be feasible and confirmable.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 15, 2024

/s/ *Manuel Gutierrez*
Manuel Gutierrez
President
M&G Transportation, LLC

**EXHIBIT A**

**M&G Transportation, LLC**
**13 Week Budget**

| Line No. | Description | 5/17/2024 | 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/14/2024 | 6/21/2024 | 6/28/2024 | 7/5/2024 | 7/12/2024 | 7/19/2024 | 7/26/2024 | 8/2/2024 | 8/9/2024 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Opening Cash | 10,000.00 | 95,528.00 | 48,395.79 | 57,460.60 | 57,311.22 | 81,814.22 | 89,741.99 | 47,457.01 | 60,188.95 | 69,680.44 | 73,403.21 | 33,018.23 | 45,750.17 | |
| 2 | Collections on A/R | 15,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | |
| 3 | Collections on New Revenue | 272,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | 162,000.00 | |
| 4 | Total Cash Receipts | 287,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 187,000.00 | 2,531,000.00 |
| 5 | | | | | | | | | | | | | | | |
| 6 | CASH DISBURSEMENTS | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | |
| 8 | Pre Petition Expenses (Payroll) | | | | | | | | | | | | | | |
| 9 | Payroll (Company Drivers) | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | |
| 10 | Owner Operator - Fees | 40,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | |
| 11 | | 40,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | 20,000.00 | |
| 12 | Office/Shop Payroll | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | |
| 13 | Officer Payroll | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 | |
| 14 | Payroll taxes | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | 6,877.00 | |
| 15 | Loading/Unloading | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | 7,500.00 | |
| 16 | Stop-Off Comp | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | |
| 17 | Tolls | 2,200.00 | 2,200.00 | | | | | | | | | | 2,200.00 | | |
| 18 | Scales | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | |
| 19 | Fuel | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | 50,000.00 | |
| 20 | Diesel Exhaust Fluid (DEF) | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | |
| 21 | Parking | | | | | | | | | | | 150.00 | 150.00 | | |
| 22 | ELD | | | 4,800.00 | 4,800.00 | | | | 4,800.00 | | | 4,800.00 | | | |
| 23 | | | | | | | | | | | | | | | |
| 24 | Financial Pacific | | 10,071.61 | 10,071.61 | 10,071.61 | | | | 10,071.61 | | | 10,071.61 | | 10,071.61 | |
| 25 | BMO Bank | | 2,267.28 | 2,267.28 | 2,267.28 | | | | 2,267.28 | | | 2,267.28 | | 2,267.28 | |
| 26 | Citizens Bank | | 2,467.91 | 2,467.91 | 2,467.91 | | | | 2,467.91 | | | 2,467.91 | | 2,467.91 | |
| 27 | Columbia River | | | 4,755.90 | 4,755.90 | | | | 4,755.90 | | | | | 4,755.90 | |
| 28 | Daimler Truck Financial | 6,305.23 | 6,305.23 | | | 6,305.23 | 6,305.23 | | | | 6,305.23 | | | | |
| 29 | Dropped Trailers | 75.00 | 75.00 | | | 100.00 | 100.00 | 100.00 | | | 125.00 | 125.00 | 125.00 | 125.00 | |
| 30 | Vehicle Repairs / Maintenance | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | |
| 31 | Building Rent | | | 6,600.00 | 6,600.00 | | | 6,600.00 | 6,600.00 | | | 6,600.00 | 6,600.00 | | |
| 32 | Bank Fees | | 25.00 | 25.00 | 25.00 | | | 25.00 | 25.00 | | | 25.00 | 25.00 | | |
| 33 | Advertising & Promotion | 500.00 | 500.00 | | | 500.00 | 500.00 | | | 500.00 | 500.00 | | | | |
| 34 | Building Maint & Repairs | | | 830.87 | 830.87 | | | 830.87 | 830.87 | | | 830.87 | 830.87 | | |
| 35 | Claims-Cargo | | | | | | | | | | | | | | |
| 36 | Cleaning & Janitorial | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | 120.00 | |
| 37 | Computer Software | 2,923.00 | 2,923.00 | 2,839.00 | 2,839.00 | 2,923.00 | 2,923.00 | 2,839.00 | 2,839.00 | 2,923.00 | 2,923.00 | 2,923.00 | 2,838.00 | 2,838.00 | |
| 38 | Drug Testing | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 675.00 | 750.00 | 750.00 | 750.00 | 750.00 | 675.00 | 750.00 | |
| 39 | Dues & Subscriptions | 675.00 | 675.00 | 683.00 | | 675.00 | 675.00 | 675.00 | | | | 8,500.00 | 683.00 | | |
| 40 | Fuel Tax Expense – State | | | | | | | 1,320.00 | | | | | | | |
| 41 | Insurance - Auto | 50,766.98 | 50,766.98 | 50,766.98 | | | | 50,766.98 | 50,766.98 | | | 50,766.98 | 50,766.98 | | |
| 42 | Gas (Utilities) | 750.00 | 750.00 | 760.00 | 760.00 | | 760.00 | 760.00 | 760.00 | | 560.00 | 750.00 | 760.00 | | |
| 43 | Insurance (workers comp, general) | | | | | | 650.00 | 830.87 | | | | | | | |
| 44 | Office Expense | 650.00 | 650.00 | | | 650.00 | | | 345.00 | | | | 345.00 | | |
| 45 | Telephone Expense | 600.00 | 600.00 | 345.00 | 345.00 | | 600.00 | 345.00 | 320.00 | 320.00 | 120.00 | 345.00 | 345.00 | 320.00 | |
| 46 | Postage and Delivery | 50.00 | 50.00 | | | | 50.00 | 50.00 | | | | 50.00 | | | |
| 47 | Triumph – Factor Fees | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | 2,050.00 | |
| 48 | Interstate Bank | 10,000.00 | 10,000.00 | | | 10,000.00 | 10,000.00 | | | | 10,000.00 | | | | |
| 49 | Internal Revenue Service (Priority Taxes) | | | | | | | 8,500.00 | | | | 8,500.00 | | | |
| 50 | Small Business Administration (EIDL) | | | 683.00 | | | | 683.00 | | | | 683.00 | | | |
| 51 | Ascend | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | |
| 52 | Carothers & Hauswirth LLP | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 5,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 7,500.00 | 7,500.00 | 2,000.00 | 2,000.00 | |
| 53 | Forshey Prostok | 2,500.00 | 2,500.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | |
| 54 | | | | | | | | | | | | | | | |
| 55 | Total Cash Disbursements | 201,472.00 | 234,132.21 | 177,935.19 | 187,149.38 | 162,497.00 | 179,072.23 | 229,284.98 | 174,268.06 | 177,508.51 | 183,277.23 | 227,384.98 | 174,268.06 | 177,508.51 | 2,485,768.34 |
| 56 | Ending Balance - Cash | 95,528.00 | 48,395.79 | 57,460.60 | 57,311.22 | 81,814.22 | 89,741.99 | 47,457.01 | 60,188.95 | 69,680.44 | 73,403.21 | 33,018.23 | 45,750.17 | 55,241.66 | 45,241.66 |
| | Net Cash Yield | 85,528.00 | (47,132.21) | 9,064.81 | (149.38) | 24,503.00 | 7,927.77 | (42,284.98) | 12,731.94 | 9,491.49 | 3,722.77 | (40,384.98) | 12,731.94 | 9,491.49 | 45,241.66 |